FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

OCT 30 2009

JAMES N. HATTEN, Clerk
BY [signature]

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| THE CIRCLE GROUP, L.L.C. And JOYCE LAIDLER, <br><br> PLAINTIFFS, <br><br> v. <br><br> THE SOUTHEASTERN CARPENTERS REGIONAL COUNCIL, OF THE UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, <br><br> DEFENDANT. | CIVIL ACTION FILE NO. <br><br> 1 09-CV-3039 <br><br> JURY DEMAND |



## COMPLAINT

COME NOW Plaintiffs The Circle Group, L.L.C., and Joyce Laidler, by and through undersigned counsel, and for their Complaint states as follows:

### Introduction

1.

Plaintiff The Circle Group, L.L.C. (hereinafter "The Circle Group") brings this action under the provisions of § 303 of the Labor Management Relations Act of 1947 (29 U.S.C. § 187), hereinafter referred to as the LMRA, to recover damages for an unlawful secondary boycott engaged in by the Defendant, and

under 15 U.S.C. § 1125(a) for trademark infringement; under 15 U.S.C. § 1125(d) for cybersquatting; under Georgia state law to recover damages for tortious interference with its contractual rights and relations, common law trademark infringement, unfair competition, and deceptive trade practices. Plaintiff Joyce Laidler brings her action under Georgia state law for invasion of her privacy.

### Parties, Jurisdiction and Venue

2.

Plaintiff The Circle Group is a limited liability company organized and existing under the laws of Georgia, with its principal office located at 1275 Alderman Drive, Alpharetta, Georgia 30005.

3.

Plaintiff Joyce Laidler is an individual who resides at 6790 Sterling Drive, Suwanee, Georgia.

4.

Plaintiff The Circle Group is, and at all times herein mentioned was, engaged in the construction industry, and, in connection therewith is engaged in interstate commerce and in an industry affecting interstate commerce, within the meaning of §

2

2(6) and (7) of the National Labor Relations Act (29 U.S.C. §
152(6) and (7)).

5.

Defendant Southeastern Carpenters Regional Council of the
United Brotherhood of Carpenters and Joiners of America
(hereinafter "Defendant Union") is an unincorporated association
and a labor organization within the meaning of § 2(5) of the
National Labor Relations Act (29 U.S.C. § 152(5)), and is
engaged in this judicial district in representing or acting for
employee members for the purpose of collective bargaining in
industries affecting interstate commerce, including the
construction industry. Defendant Union may be served with
process through delivery of a copy of this Complaint and Summons
to Jimmy Gibbs, Director of Special Projects, 3500 Atlanta
Industrial Drive, Fulton County, Atlanta, Georgia, 30331.

6.

This Court has subject matter jurisdiction over this action
pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 28
U.S.C. § 1337, and 28 U.S.C. § 1338 and 29 U.S.C. § 187(b) and 28
U.S.C. § 1367 (supplemental jurisdiction).

7.

Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391(b).

**General Background Regarding The Circle Group**

8.

The Circle Group has been in business for approximately 9 years. At times relevant hereto, The Circle Group has been engaged in the business of interior construction/drywall installation. In the last two years, The Circle Group has employed anywhere from 150 to 1100 employees. Presently, it employs 150-200 employees. The Circle Group performs work on project sites throughout the Southeastern United States and elsewhere, including the greater Atlanta area.

**COUNT I: THE UNION'S UNLAWFUL SECONDARY ACTIVITIES IN VIOLATION OF SECTIONS 8(b)(4)(ii)(A) AND (B) OF THE NATIONAL LABOR RELATIONS ACT**

9.

Since on or about October 2007, Defendant Union has threatened, coerced or restrained various other employers and entities, including, but not limited to, Klaus-Anderson Construction Co.; Cousins Properties; AmeriPrise Financial;

Barton Malow; the Atlanta Braves; ANLBC; Lenbrook Square; Georgia Power; Lenox Station; Brassfield & Gore; Terminus 100 Bldg.; Holder Construction Co.; Rosewood Properties; Hotel Palomar; Brickell Financial Center; St. Regis Hotel; Omni Hotel; Georgia World Conference Center (GWCC); Molson; Trammell Crow; Hardin Construction Co.; Skanska; Chops Restaurant; Kim King Associates; Rosewood Hotel and Resorts; W. Hotel; Barry Real Estate; Berry College; R. J. Griffin & Co.; Chick Fil A at Peachtree Center; the Marriott Co.; Flynn Crossing Shopping Center; One Atlantic Center, all of which are persons engaged in interstate commerce or in an industry affecting interstate commerce, within the meaning of § 2(6) and 2(7) of the National Labor Relations Act, and other persons engaged in interstate commerce or an industry affecting interstate commerce (Entities), with an object of: (a) forcing or requiring The Circle Group to join Defendant Union; and/or (b) forcing or requiring the entities to cease doing business with The Circle Group. Defendant Union's conduct violates Sections 8(b)(4)(ii)(A) and (B) of the National Labor Relations Act relating to secondary boycotts (29 U.S.C. § 158(b)(4)(ii)(A) and (B)).

5

Since on or about October 2006, Defendant Union has threatened, coerced or restrained various individual managers or executives, including, but not limited to, Mike Plant, Preston Williams, Phil Roy, Beau King, Jr., Dr. Stephen Briggs, John Schuerholz, Steve Kirnan, Eric Hamm, Jeff Roberson, and Greg Heller, Donald Wilson, Brad Harvey, John Stencil, John Moriarity, Debby Taylor, and Donna Barrett, all of which are persons engaged in interstate commerce or in an industry affecting interstate commerce, within the meaning of § 2(6) and 2(7) of the National Labor Relations Act, and other persons engaged in interstate commerce or an industry affecting interstate commerce (Entities), with an object of: (a) forcing or requiring The Circle Group to join Defendant Union; and/or (b) forcing or requiring the entities to cease doing business with The Circle Group. Defendant Union's conduct violates Sections 8(b)(4)(ii)(A) and (B) of the National Labor Relations Act relating to secondary boycotts (29 U.S.C. § 158(b)(4)(ii)(A) and (B)).

## The Defendant Union's "Area Standards" Campaign

### 11.

Since on or about October 2006, the Defendant Union has carried on what it characterizes as its "Area Standards" campaign in the metro Atlanta and surrounding areas. The campaign has targeted non-union interior and drywall contractors, such as The Circle Group, that are performing work in commercial buildings.

### 12.

The Defendant Union sent its agents and/or employees into buildings, at times with video cameras, to determine what companies were performing the interior and drywall work on various jobs. When the Defendant Union discovered that a non-union subcontractor such as The Circle Group was performing the interior and drywall work, the Defendant Union would send a Warning Letter to various third party neutrals, including the general contractor, building owner, building leasing agent, and even tenants, among others. The Warning Letter advised the third party neutrals to cease using the non-union contractor because it did not meet "area standards." However, those "area standards" were never specified. In the event that the third party neutral did not terminate its relationship with the non-

union sub-contractor such as The Circle Group, the Warning Letter threatened demonstrations (picketing) and an "adversarial relationship."

13.

The recipients of the Warning Letter were not informed that the demonstrations (picketing) would be directed solely to the non-union subcontractor, such as The Circle Group, or what signage would be on the picket signs, whether the pickets would only be there when employees of the non-union subcontractor, such as The Circle Group were there, or that the picketing would be directed only to the employees of the non-union subcontractor, such as The Circle Group at a site close to their location.

14.

When the picketing was conducted, most of the picket signs said "Maintain Area Standards for Carpenters" and only a few would mention the name of the primary target of the labor dispute.

15.

When the picketing was conducted, the pickets were as loud as possible, often using noise makers, and would usually shout

8

the name of the tenant, building owner, or the property manager, as being a "Rat" or a "Big Rat Hole." Persons around or attempting to enter the locale of the picketing would usually conclude that the picketing was directed toward the tenant, building owner, or the property manager, the subject of the chants.

16.

Oftentimes the Defendant Union used mass numbers of picketers, as many as 150 pickets at single locations. The Defendant Union was publicly quoted and bragged about their picketers as a "hundred, screaming, nasty pickets."

17.

The Defendant Union also bragged about disrupting activities directed toward the third party neutrals, including causing harassment, loss of business, interruptions of deliveries, and the like. The Defendant Union-directed pickets used the approach that the more disruptive their pickets were on the third parties, the better, because they considered the third parties to be the targets of their labor dispute.

18.

As a result of the Defendant Union's coercive activities directed towards third parties, many third parties ceased doing business with the non-union subcontractors, such as The Circle Group, which was the purpose and the effect of the union's coercive activities. Among those third parties who ceased doing business or substantially curtailed their business with The Circle Group because of the coercive union activities included, but were not limited to, Kraus-Anderson, Cousins Properties, Bovis Lend Lease, the St. Regis Hotel, Barton Marlow, Skanska, Ameriprise, among others.

19.

The union's secondary objectives were further demonstrated by the fact their so-called "area standards" campaign was only a pretext for their unlawful activities. In contrast to non-union entities, the Defendant Union did not require its own union contractors to meet "area standards." The Defendant Union's Collective Bargaining Agreement specifically allows subcontractors of union contractors to pay any range of pay and benefits, whether they met "area standards" or not.

20.

The ultimate objective of the Defendant Union was to make Atlanta and its outlying suburbs areas all union for construction work, beginning with downtown Atlanta, and the Defendant Union regularly documented its success in achieving that goal. The Defendant Union published regular reports outlining the increasing union concentration of work and had a large poster in its headquarters breaking down union jobs and "Rat" jobs, referring to anything that was non-union.

21.

On many occasions the Defendant Union varied its approach, often setting up persons to hold large signs that were approximately 4' by 20' in size, that would say "Shame On" some innocent third party, and indicate in smaller print that it was a labor dispute. In connection with these large signs, the Defendant Union would generally have a number of their agents patrolling and aggressively handing out papers, often congregating in numbers and forcing the papers on all persons who tried to pass or otherwise harassing those persons until they took a paper. Further, the large signs were often placed in a location designed to be most disruptive to the neutral third parties and their business.

The Defendant Union often placed the signs and persons passing out papers in specific locations designed to coerce the neutral third parties to stop doing business with non-union subcontractors such as the Circle Group, in order to put an end to the Union activities. Indeed, the neutral third parties often asked the Defendant Union what they had to do to get the coercive union actions to stop, and the usual response by Union officials would be, to remove The Circle Group from the job or otherwise to cease doing business with them.

23.

On at least one occasion, the Defendant Union convened a large gathering in downtown Atlanta of general contractors, building owners, property managers, and other third parties. The purpose of the meeting was to determine what these third party neutrals could do to stop coercive union activity towards them at their facilities. The Defendant Union told the third party neutrals that the solution was to cease doing business with the non-union primary employers, including, The Circle Group. The Defendant Union maintained a "Do Not Use" list of non-union subcontractors, including The Circle Group. The third party neutrals agreed at the general meeting to provide the

Defendant Union with the information about which sub-contractors they were using so that the third party neutrals could keep up with those on the "Do No Use" union list.

24.

The Defendant Union told some third party neutrals they would continue to target their jobs until they discontinued their relationship with non-union subcontractors, such as The Circle Group. The Defendant Union would sometimes refer to this as disrupting the business of the third party neutral unless they stop doing business with The Circle Group. Sometimes they attempted to disguise their unlawful activities with "code" names such as causing "trouble" for these third parties. Nevertheless, the Defendant Unions' intent was clear—to coerce the third party neutral to stop doing business with the non-union subcontractor, such as The Circle Group.

25.

The Defendant Union bragged about the type "trouble" it could cause third parties. On one occasion, the Defendant Union engaged in such coercive activities around Colony Square, that the Superior Court of Fulton County entered an injunction against the coercive activities. The types of coercive activities around Colony Square were the subject of some

notoriety in the Atlanta area. The Defendant Union was proud of these coercive activities, as they were intimidating to third parties, and at the point the Defendant Union considered the injunction no longer in effect, the Defendant Union notified as many third parties as possible that the disruptive activities would commence just like they had been conducted around Colony Square, thus intimidating third parties receiving the threatening statement. The Defendant Union attempted to create the public image that the third parties would have widespread trouble if they continued doing business with non-union subcontractors such as The Circle Group.

26.

When picketing, the Defendant Union did not always picket at a location reasonably close to the location of the employees of the primary target of its dispute, such as The Circle Group. In fact, in many cases it was quite obvious that the Defendant Union intentionally picketed at a location designed to harass third neutrals, rather than appeal to the employees of the primary employer, thus further evidencing the Defendant Union's secondary objective.

27.

At times the Defendant Union's pickets were so noisy that the police were summoned, and at other times the pickets trespassed on private property. Similarly, at times the pickets used harsh and obscene name-calling such as "Bitch," "Faggot," "M-F," and other such terminology, towards persons attempting to enter or deal with the third party neutral's facility.

28.

The Defendant Union would further show its secondary objectives by verbally threatening third parties in many ways, including the announcement that it would "picket" a building, without specifying that they would only picket the primary target, such as The Circle Group. Or, the Defendant Union would refer to the use of code words such as causing the third party neutral "trouble," in ways that created a clear message to the third party neutrals that the neutrals would be picketed and otherwise disrupted and coerced if they did not cease doing business with non-union subcontractors such as The Circle Group.

29.

There were many other ways the Defendant Union showed that its so-called "area standards" objectives were merely a pretext

for unlawful activities. For example, in some cases the Defendant Union would indicate that "area standards" included paying certain specific union benefits, such as a fully employer-paid pension plan, insurance plan, training program, and other such specific levels of benefits. The use of such specific levels of benefits was designed so the only way an employer could comply would be to recognize the union. This was particularly so since it was virtually impossible for an employer to pay such benefits on a project or job only basis.

30.

In addition, and particularly in the case of The Circle Group, the Defendant Union would not tell The Circle Group what its "area standards" were. Despite repeated requests on the part of The Circle Group to the Defendant Union, the Defendant Union steadfastly refused to supply The Circle Group this information. As a result, the intent and effect of the Defendant Union's actions were to require non-union subcontractors such as The Circle Group to recognize the union if their labor dispute with the Defendant Union was to end. This was particularly true since based on information and belief, The Circle Group in many cases met, and exceeded, so-called union "area standards."

That the Defendant Union's objectives were secondary is further demonstrated by the fact that officials of the Defendant Union termed all general contractors, building owners, property managers, and tenants that had any direct or indirect relationship in any way with non-union subcontractors such as The Circle Group, as "targets" and the entire campaign was designed to direct pressure towards these innocent third parties. The Defendant Union hoped to hurt these third parties, or cause them "trouble," in order to get them to cease doing business with non-union subcontractors such as The Circle Group, or to require non-union subcontractors such as The Circle Group to recognize the Union.

As an example of the coercive statements made to third parties, the Defendant Union's officials were quoted in the Atlanta newspapers with statements like "If the building owners or property managers don't get rid of substandard contractors, there will be a hundred screaming pickets at their door."

The Defendant Union would also publicly brag about the coercive nature of its tactics, describing them as "assaults," "punitive," "a hundred nasty, screaming picketers," and other such terms. The Defendant Union even referred to its own picketers as "oral hit men."

Agents of the Defendant Union have basically admitted on various occasions that their campaign was designed to run non-union subcontractors such as The Circle Group out of town, and that the targets of their campaign was not the non-union subcontractors such as The Circle Group, but third party neutrals, and that the Defendant Union's activities were thus directed to put pressure on these innocent third parties.

As further evidence of its illegal secondary objectives, the Defendant Union published a list of "acceptable" contractors to general contractors, building owners, property managers, and other third parties. All of the "acceptable" contractors were represented by the Defendant Union. This list also demonstrated the Defendant Union's illegal secondary objective of requiring

non-union subcontractors such as The Circle Group to recognize the union.

36.

Because at least one of the objectives of the Defendant Union was to require third party neutrals to cease doing business with a primary employer, like The Circle Group, or to require a primary employer to recognize the Defendant Union, the secondary objectives deem the entire activities unlawful.

37.

The neutral third parties that were the targets of the illegal secondary activities of the Defendant Union were reasonably and objectively coerced by the secondary activities, and ceased doing business with the primary employer, The Circle Group, as a result.

38.

The Defendant Union's officials themselves determined that general contractors, building owners, and property managers, and tenants were not willing to cease doing business with the non-union primary employer, such as the Circle Group, out of the goodness of their hearts, but only because they did not want to face a hundred, screaming, nasty, picketers, or other such

19

coercive union activities, and otherwise have their businesses disrupted. The Defendant Union's objectives were to foster just that view among the third parties.

## Specific Allegations Regarding The Circle Group

### 39.

Plaintiffs incorporate their allegations stated in paragraphs 1 through 38 of the Complaint as if fully restated herein.

### 40.

In October 2008, The Circle Group was awarded a subcontract by Barton Malow to perform interior construction work on a project at the new stadium of the Gwinnett Braves, a minor league baseball team, in Lawrenceville, Georgia. Barton Malow was hired by the Gwinnett Convention and Visitors' Bureau (GCVB) as the general contractor to build the stadium. GCVB and the Atlanta National League Baseball Club, Inc. (ANLBC), the company that owns the Gwinnett Braves and the Atlanta Braves, are parties to a stadium agreement whereby GCVB agreed to build a stadium for use by the Gwinnett Braves. While ANLBC approved Barton Marlow as the general contractor for the stadium project,

ANLBC had no input in the hiring of the Circle Group by Barton Marlow.

41.

On or around October 14, 2008, the Defendant Union sent Warning Letters to Barton Malow and the Atlanta Braves. Those letters threatened that if Barton Malow and the Atlanta Braves (two neutral third parties) did not comply with the Defendant Union's demand that they remove the Circle Group (the primary party to the labor dispute) from their projects, the Defendant Union would engage in its usual mass demonstrations and other pressure tactics directed at the jobsites and premises of the neutral third parties.

42.

The letters threatened that if Barton Malow and the Atlanta Braves did not comply with the Union's demand that they remove The Circle Group from their projects, the Union would engage in "highly visible lawful banner displays, **demonstrations** and distributions of handbills" at their jobsites and premises. (emphasis added).

43.

Despite the claim that the conduct would be lawful, the Defendant Union enclosed material demonstrating that it would unlawfully target neutral employers. Enclosed with the letter was a picture of a sample 4-foot by 20-foot (4' x 20') banner targeting neither Barton Malow nor The Circle Group, but rather the Atlanta Braves ("Shame on Braves"), a sample handbill stating "Shame on the Braves for Desecrating the American Way of Life" and referencing the Barton Malow project for the Gwinnett Braves, and the Union's sample "Instructions for Demonstrators."

44.

The "Instructions for Demonstrators" list made it clear that far more would occur than the mere holding of a sign. The list contained the following rules for individuals "participating in a demonstration sanctioned by the Southeasters Carpenters Regional Council":

1. Before demonstrating, you must sign-in with the demonstration Sergeant.
2. DO NOT TALK TO ANYONE. Refer all questions to the demonstration Captain.
3. DO NOT INTERFERE WITH PERSONS ENTERING OR LEAVING THE JOB.
4. If the primary contractor leaves the jobsite, stop demonstrating until the primary contractor returns to the site.

22

5.   If you are on public property, private
     individuals (e.g. the owner of the
     building/property at which you are handbilling)
     cannot compel you to leave. If, however, you are
     on private property, any effort to compel you to
     leave should be referred to the Special Projects
     Representative or other designated Union
     official.

                              45.

On October 29, 2008, as evidence of its unlawful secondary
intent, the Defendant Union displayed very large signs--not at
the Gwinnett Braves' stadium project--but outside of Turner
Field, the home of the Atlanta Braves Major League Baseball
team. Neither the Circle Group nor Barton Malow were doing any
work at Turner Field or for the Atlanta Braves. The body of the
banner read "SHAME ON MIKE PLANT OF THE ATLANTA BRAVES" without
identifying The Circle Group or the Union's labor dispute with
The Circle Group.

                              46.

Consistent with its regular practice, in addition to the
very large sign, the Defendant Union placed a large number of
their agents to aggressively hand out papers that contained a
number of false accusations.   For example, the papers falsely
alleged that The Circle Group failed to meet "area standards".
However, the papers did not state what those "area standards"
were or how The Circle Group allegedly failed to meet them.   The

papers further falsely stated that "Gwinnett Braves is [sic] using Circle Group to perform work on their project located in Atlanta." However, the Gwinnett Braves were not directly using The Circle Group for any project; The Circle Group was hired by Barton Malow without input from the Braves. Moreover, the project was not in Atlanta. Rather it was located in Lawrenceville, Georgia, about 35 miles from downtown Atlanta and Turner Field.

47.

Defendant Union's activities threatened, coerced or restrained the Atlanta Braves and other persons engaged in commerce, with an object of forcing the Circle Group to join Defendant Union and/or forcing the Atlanta Braves and other persons engaged in commerce including Barton Malow to cease doing business with The Circle Group, which is proscribed by Sections 8(b)(4)(ii)(A) and (B) of the National Labor Relations Act (29 U.S.C. § 158(b)(4)(ii)(A) and (B)). In addition, at least one of the objectives of the Defendant Union's picketing was to induce or encourage employees of third parties to refuse to work, in violation of Sections 8(b)(4)(ii)(B) of the National Labor Relations Act (29 U.S.C. § 158(b)(4)(ii)(B)). The Circle

Group has been injured in its business by Defendant Union's illegal activities.

48.

On November 11, 2008, the Union intensified its pressure on the Atlanta Braves, a neutral party, in pursuit of its unlawful secondary objective. The Defendant Union relocated the 4-foot by 20-foot sign that was in front of Turner Field, as well as the attendant loud and aggressive group of union agents, to a location within a few hundred yards of the school that Mike Plant's children attend, at Highway 74 and Kedron Drive in Peachtree City, Georgia. The Circle Group was not performing any work at that school.

49.

Having not received the desired response from the Atlanta Braves, at or around November 2008, the Defendant Union extended its unlawful conduct to The Walt Disney Company, which owns the Atlanta Braves' spring training facilities. The Defendant Union threatened to "make trouble" outside Disney's baseball park in Florida during Major League Baseball Spring Training, which is the Defendant Union's usual code for mass demonstrations and similar disruptive activities. The Circle Group performs no work

25

for Disney, and did not perform any work for Disney during Spring Training.

50.

On November 24, 2008, the Defendant Union expanded its conduct beyond the Atlanta area, targeting Barton Malow offices throughout the United States. On that day, and continuing for several days, the Defendant Union set up signs and contingents of loud demonstrators on the sidewalk directly outside of the following Barton Malow offices: Chicago, Illinois; Columbus, Ohio; Baltimore, Maryland; Chantilly, Virginia; and one other office in the Eastern region. During that same time, the Union also placed large signs at two Barton Malow jobsites at which The Circle Group has not and does not perform any work.

51.

Thereafter, the union posted a very large sign and its usual contingent of noisy demonstrators outside of the Barton Malow office located at 200 Mansell Court East, Suite 100 in Roswell, Georgia. The sign stated "LABOR DISPUTE" in the upper-right and upper-left hand corners and the body of the banner reads "SHAME ON PHIL ROY" in larger print. The Circle Group was not performing any work at this, or any other, Barton Malow

office. In addition, the Defendant Union sent signs and demonstrators into Phil Roy's neighborhood.

52.

The Defendant Union has also targeted at least one other individual involved with the Gwinnett Braves' stadium project - Preston Williams, the General Manager of the Gwinnett Convention and Visitors Bureau. As part of his role as the General Manager of the GCVB, Preston Williams served as the Project Manager for the new stadium project. The Defendant Union erected a sign similar to those described above identifying Preston Williams and alleging a "labor dispute" with him and posted its usual contingent of noisy demonstrators in the vicinity of the sign.

53.

Defendant Union's activities threatened, coerced or restrained Barton Malow and other persons engaged in commerce, including the Atlanta Braves, the Walt Disney Company, and the Gwinnett Visitors and Convention Bureau, with an object of forcing The Circle Group to join Defendant Union and/or forcing Barton Malow and other persons engaged in commerce to cease doing business with The Circle Group, which is proscribed by Sections 8(b)(4)(ii)(A) and (B) of the National Labor Relations Act (29 U.S.C. § 158(b)(4)(ii)(A) and (B)). In addition, at

least one of the objectives of the Defendant Union's picketing was to induce or encourage employees of third parties to refuse to work, in violation of Sections 8(b)(4)(ii)(B) of the National Labor Relations Act (29 U.S.C. § 158(b)(4)(ii)(B)). The Circle Group has been injured in its business by Defendant Union's illegal activities.

54.

On or about March 25, 2008, in the aftermath of a highly destructive tornado that struck downtown Atlanta, The Circle Group was hired to perform interior construction work by Holder Construction Company at the Georgia World Congress Center convention facility and by Skanska at the Omni Hotel at CNN Center. As a result, on or around June 11, 2008, the Defendant Union sent a Warning Letter to the Georgia World Congress Center. The letter made the usual threats that if the Georgia World Congress Center did not force Holder Construction to remove The Circle Group from the project, the Union would engage in mass demonstrations at its jobsites and elsewhere.

55.

Approximately week later, the Defendant Union sent at least 100 people to picket at the Georgia World Congress Center, not limiting those pickets to the projects where The Circle Group

was working. The picketers beat on plastic tubs to annoy and harass all around them. Initially, the Defendant Union located its pickets on the private property of the Georgia World Congress Center and had to be removed by building security. After being removed from the Georgia World Congress Center's private property, the Defendant Union moved its noisy protesters down the street and continued to picket and demonstrate in front of the Omni Hotel, making ingress and egress from the hotel difficult or at times, impossible. The Union picketing and demonstrations continued through early July. Along with the picketing, the demonstrators aggressively distributed handbills. The Defendant Union's protesters picketed and demonstrated at the Georgia World Congress Center even though The Circle Group was not performing work there.

56.

Defendant Union's activities threatened, coerced or restrained the Holder Construction and other persons engaged in commerce including the Georgia World Congress Center, Skanska and the Omni Hotel, with an object of forcing the Circle Group to join Defendant Union and/or forcing Holder Construction and other persons engaged in commerce, including the Georgia World Congress Center, Skanska and the Omni Hotel, to cease doing

business with The Circle Group, which is proscribed by Sections 8(b)(4)(ii)(A) and (B) of the National Labor Relations Act (29 U.S.C. § 158(b)(4)(ii)(A) and (B)). In addition, at least one of the objectives of the Defendant Union's picketing was to induce or encourage employees of third parties to refuse to work, in violation of Sections 8(b)(4)(ii)(B) of the National Labor Relations Act (29 U.S.C. § 158(b)(4)(ii)(B)). The Circle Group was injured in its business by Defendant Union's illegal activities.

57.

The Circle Group was hired on or about November 8, 2007, by Bovis Lend Lease to perform interior construction work on a project at the St. Regis hotel. On or around January 7, 2008, the Defendant Union sent a Warning Letter to the St. Regis. The letter made the usual threats that if the St. Regis did not force Bovis to remove The Circle Group from the project, the Union would engage in mass demonstrations and other disruptive activities targeted at Bovis and the St. Regis, the neutral third parties. In addition, on or about January 24, 2008, the Defendant Union sent a Warning Letter to Bovis Lend Lease threatening demonstrations at a Bovis project located at Lenbrook Square, a retirement community.

58.

On or around July 16, 2008, the Defendant Union sent a number of "nasty picketers" to the St. Regis to conduct demonstrations. The noisy and disruptive demonstrations continued for six to eight weeks. The picketing initially took place on the side of the building, directly in front of Chops Restaurant, a steakhouse located inside the St. Regis. The entrance to the job site was located down the street. After Chops Restaurant called the police to complain about the demonstrators blocking their valet driveway and disturbing their patrons, the Defendant Union also set up a drum to create additional noise and disturb the dining patrons at Chops Restaurant.

59.

Defendant Union's activities threatened, coerced or restrained Bovis Lend Lease and other persons engaged in commerce including the St. Regis and Lenbrook Square, with an object of forcing the Circle Group to join Defendant Union and/or forcing Bovis Lend Lease and other persons engaged in commerce, including the St. Regis and Lenbrook Square, to cease doing business with The Circle Group, which is proscribed by Sections 8(b)(4)(ii)(A) and (B) of the National Labor Relations

Act (29 U.S.C. § 158(b)(4)(ii)(A) and (B)). In addition, at least one of the objectives of the Defendant Union's picketing was to induce or encourage employees of third parties to refuse to work, in violation of Sections 8(b)(4)(ii)(B) of the National Labor Relations Act (29 U.S.C. § 158(b)(4)(ii)(B)). The Circle Group was injured in its business by Defendant Union's illegal activities.

60.

The Circle Group was hired on or about October 22, 2007, by Hardin Construction Company to perform interior construction work on a project at the Hotel Palomar. Hardin Construction undertook this project for Kim King Associates, LLC, the owners of the Hotel Palomar. As a result, on or around July 28, 2008, the Union sent a Warning Letter to Kim King Associates. The letter threatened that if Kim King Associates did not force Hardin Construction to remove The Circle Group from the project, the Union would engage in its usual disruptive demonstrations directed at Kim King Associates.

61.

On January 21, 2009, the Defendant Union posted a very large sign containing misleading and false information at the offices of Kim King Associates along with a contingent of noisy

32

agents of the Defendant Union. This sign stated "LABOR DISPUTE" in both the upper left and upper right corners. The body of the sign read "SHAME ON BEAU KING Jr. OF KIM KING ASSOC." without identifying The Circle Group or the Defendant Union's labor dispute with The Circle Group, in any way. The sign and the accompanying agents of the Defendant Union were located directly in front of the entrance to the building containing the offices of Kim King Associates. The building is located at 75 Fifth St, NW, Atlanta, Georgia. The Circle Group was not performing any work at the building where the sign and Defendant Union agents were located. In fact, the only location where The Circle Group was performing work on a Kim King Associates project was at the Hotel Palomar, almost a mile away. Moreover, the Defendant Union's picketing and demonstrations directed toward Kim King Associates continued even after The Circle Group had finished performing work at the Hotel Palomar.

62.

Defendant Union's activities threatened, coerced or restrained Kim King Associates and other persons engaged in commerce, with an object of forcing the Circle Group to join Defendant Union and/or forcing the Kim King Associates and other persons engaged in commerce including, Hardin Construction and

33

the Hotel Palomar, to cease doing business with The Circle Group, which is proscribed by Sections 8(b)(4)(ii)(A) and (B) of the National Labor Relations Act (29 U.S.C. § 158(b)(4)(ii)(A) and (B)). In addition, at least one of the objectives of the Defendant Union's picketing was to induce or encourage employees of third parties to refuse to work, in violation of Sections 8(b)(4)(ii)(B) of the National Labor Relations Act (29 U.S.C. § 158(b)(4)(ii)(B)). The Circle Group was injured in its business by Defendant Union's illegal activities.

63.

Further, on or about November 28, 2007, The Circle Group was hired by Holder Construction to perform interior construction work on a project at The Mansion on Peachtree, which is owned by Rosewood Hotel & Resorts. In October 2008, and continuing thereafter, the Defendant Union sent a Warning Letter to The Mansion on Peachtree. The Warning Letter threatened that if The Mansion on Peachtree did not force Holder Construction to remove The Circle Group from the project, the Union would engage in its usual disruptive activities and demonstrations.

64.

Thereafter, the Defendant Union engaged erected a large sign outside of The Mansion on Peachtree. In addition to the

sign, the Defendant Union sent out a contingent of loud protesters to aggressively hand out papers to people trying to pass.

65.

Defendant Union's activities threatened, coerced or restrained the Mansion on Peachtree and other persons engaged in commerce including the Holder Construction, with an object of forcing the Circle Group to join Defendant Union and/or forcing the Mansion on Peachtree and other persons engaged in commerce including Holder Construction to cease doing business with The Circle Group, which is proscribed by Sections 8(b)(4)(ii)(A) and (B) of the National Labor Relations Act (29 U.S.C. § 158(b)(4)(ii)(A) and (B)). In addition, at least one of the objectives of the Defendant Union's picketing was to induce or encourage employees of third parties to refuse to work, in violation of Sections 8(b)(4)(ii)(B) of the National Labor Relations Act (29 U.S.C. § 158(b)(4)(ii)(B)). The Circle Group was injured in its business by Defendant Union's illegal activities.

66.

In April 2008, The Circle Group was hired by Hardin Construction Company to perform interior construction work on

the W Hotel. Shortly thereafter, the Defendant Union sent a Warning Letter to Barry Real Estate, the owner of the W Hotel. By that letter, dated April 28, 2008, the Defendant Union threatened its usual disruptive demonstrations against Barry Real Estate if Barry Real Estate did not comply with the Union's demand that it force Hardin Construction to remove The Circle Group from any of its projects for Barry Real Estate.

67.

Defendant Union's activities threatened, coerced or restrained Barry Real Estate and other persons engaged in commerce including Hardin Construction, with an object of forcing the Circle Group to join Defendant Union and/or forcing the Barry Real Estate and other persons engaged in commerce including Hardin Construction to cease doing business with The Circle Group, which is proscribed by Sections 8(b)(4)(ii)(A) and (B) of the National Labor Relations Act (29 U.S.C. § 158(b)(4)(ii)(A) and (B)). In addition, at least one of the objectives of the Defendant Union's picketing was to induce or encourage employees of third parties to refuse to work, in violation of Sections 8(b)(4)(ii)(B) of the National Labor Relations Act (29 U.S.C. § 158(b)(4)(ii)(B)). The Circle Group

was injured in its business by Defendant Union's illegal activities.

68.

The Defendant Union has also targeted at least one other individual - Dr. Stephen Briggs, the President of Berry College - in an attempt to get The Circle Group removed from a project. The Defendant Union sent a Warning Letter to Dr. Stephen Briggs in mid-November 2008 in an attempt to have The Circle Group stop the work it was performing for R.J. Griffin & Co., the general contractor on a project to construct two dormitories for Berry College.

69.

Thereafter, the Union erected a large sign identifying Dr. Stephen Briggs and alleging a "labor dispute" with him. The sign stated "LABOR DISPUTE" in the upper-right and upper-left hand corners. The body of the sign read "SHAME ON DR. STEPHEN BRIGGS OF BERRY COLLEGE" in larger print. The sign was originally put up on or around November 26, 2008, and was located at a major intersection across the street from an entrance to the Berry College campus. As president of Berry College, Dr. Stephen Briggs works and lives on campus.

Defendant Union's activities threatened, coerced or restrained R.J. Griffin & Co. and other persons engaged in commerce including the Berry College and Dr. Stephen Briggs, with an object of forcing the Circle Group to join Defendant Union and/or forcing the R.J. Griffin & Co. and other persons engaged in commerce including Berry College and Dr. Stephen Briggs, to cease doing business with The Circle Group, which is proscribed by Sections 8(b)(4)(ii)(A) and (B) of the National Labor Relations Act (29 U.S.C. § 158(b)(4)(ii)(A) and (B)). In addition, at least one of the objectives of the Defendant Union's picketing was to induce or encourage employees of third parties to refuse to work, in violation of Sections 8(b)(4)(ii)(B) of the National Labor Relations Act (29 U.S.C. § 158(b)(4)(ii)(B)). The Circle Group was injured in its business by Defendant Union's illegal activities.

71.

In 2007, The Circle Group was hired by Kraus-Anderson Construction Company to work on a project for Ameriprise Financial at 3280 Peachtree Road, Atlanta, Georgia. The property was managed by Cousins Properties.

72.

In October and November 2007, the Defendant Union picketed Cousins Properties and Kraus-Anderson Construction Company. The picketing was not confined to areas where The Circle Group was working. The Defendant Union also contacted Ameriprise Financial's headquarters and threatened to hold demonstrations at their locations across the country unless The Circle Group was removed from the 3280 Peachtree Road project. On January 10, 2008, Kraus-Anderson notified The Circle Group that it was to suspend its work on the 3280 Peachtree Road project and leave the site. The Circle Group has not performed any work for Kraus-Anderson since that time.

73.

Defendant Union's activities threatened, coerced or restrained Kraus-Anderson Construction Company and other persons engaged in commerce including Cousins Properties and Ameriprise Financial, with an object of forcing the Circle Group to join Defendant Union and/or forcing Kraus-Anderson Construction Company and other persons engaged in commerce including Cousins Properties and Ameriprise Financial, to cease doing business with The Circle Group, which is proscribed by Sections 8(b)(4)(ii)(A) and (B) of the National Labor Relations Act (29

U.S.C. § 158(b)(4)(ii)(A) and (B)). In addition, at least one of the objectives of the Defendant Union's picketing was to induce or encourage employees of third parties to refuse to work, in violation of Sections 8(b)(4)(ii)(B) of the National Labor Relations Act (29 U.S.C. § 158(b)(4)(ii)(B)). The Circle Group was injured in its business by Defendant Union's illegal activities.

74.

In 2007, The Circle Group was awarded a contract to perform work at 300 17th Street, a high rise office building in the Atlantic Station development. The General Contractor on the project was Brassfield and Gorie. However, before the contract was finalized, the Project Manager for Brassfield and Gorie, informed The Circle Group that the contract was terminated. The Circle Group believes that Brassfield and Gorie did not use The Circle Group out of fear of demonstrations and other disruptive activities by the Defendant Union.

75.

Defendant Union's activities threatened, coerced or restrained the Brassfield and Gorie and other persons engaged in commerce, with an object of forcing the Circle Group to join Defendant Union and/or forcing Brassfield and Gorie and other

40

persons engaged in commerce to cease doing business with The Circle Group, which is proscribed by Sections 8(b)(4)(ii)(A) and (B) of the National Labor Relations Act (29 U.S.C. § 158(b)(4)(ii)(A) and (B)). In addition, at least one of the objectives of the Defendant Union's picketing was to induce or encourage employees of third parties to refuse to work, in violation of Sections 8(b)(4)(ii)(B) of the National Labor Relations Act (29 U.S.C. § 158(b)(4)(ii)(B)). The Circle Group was injured in its business by Defendant Union's illegal activities.

76.

In October and November 2007, the Defendant erected a large sign near the intersection of Windward Parkway and Alderman Drive in Alpharetta near the entrance to the business park in which The Circle Group' office is located. The Defendant did not have a permit from the City of Alpharetta to erect the sign. However, the Defendant Union informed the City of Alpharetta that the Defendant Union's erection of the sign constituted "picketing" and therefore, they did not need a sign permit.

77.

In addition to the specific projects mentioned herein, Defendant Union has sent letters not only to the Entities

41

identified herein, but also to many other property owners, general contractors, potential customers, and even neighbors. These letters threatened that Defendant Union would engage in coercive sign displays, demonstrations, adversarial acts, and other coercive activities if Defendant Union's prohibited secondary objectives with respect to The Circle Group were not met. Said letters were particularly coercive in light of the fact that Defendant Union has become well known for coercive acts including, but not limited to, coercive signs, demonstrations, and other adversarial acts, further resulting in the loss of current and future business for The Circle Group.

78.

Defendant Union's campaign of coercion has resulted in substantial losses of business to The Circle Group. Numerous building managers, general contractors, tenants and other entities have either completely or partially terminated their business relationships with The Circle Group.

79.

The Defendant Union's campaign against The Circle Group purports to be a protest that The Circle Group does not meet "area standards." Despite a number of requests, the Defendant Union has refused to provide any information to The Circle Group

42

which would support its "area standards" claims. To this date, the Union has not provided any information concerning what it believes are the "area standards" that the Defendant Union claims it wants The Circle Group to meet.

80.

Nevertheless, based upon its own investigation, The Circle Group believes that it meets, and in most cases exceeds, area standards. Thus, the Defendant Union's allegations regarding the Circle Group's alleged failure to meet "area standards" are a sham, and the Defendant's Union's true intent is to force The Circle Group to join the Union and/or coerce third parties to cease or refrain from doing business with the Circle Group.

81.

Indeed, as further evidence that the "area standards" nature of the Defendant Union's campaign is a sham, in 2005 or 2006, The Circle Group was hired by Skanska to perform a job at One Atlantic Center. The Defendant Union sent a Warning Letter to Skanska threatening picketing and demonstrations. In response, representatives of The Circle Group met with representatives of the Defendant Union. The Defendant Union inquired as to how The Circle Group compensated its employees, including employee benefits. After The Circle Group explained

how it compensated its employees and that it did provide those employees with health insurance, the Defendant Union appeared to be satisfied that The Circle Group met the Defendant Union's so-called "area standards." The representatives of The Circle Group and the Defendant Union made a handshake agreement that the Defendant Union would not picket any jobs by The Circle Group. Thereafter, the Defendant Union did picket or handbill at One Atlantic Center while The Circle Group was performing work there.

**COUNT II: TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**

82.

Plaintiffs incorporate their allegations stated in paragraphs 1 through 81 of the Complaint as if fully restated herein.

83.

The Court has supplemental jurisdiction over this claim pursuant to 28 U.S.C. § 1367.

84.

In many instances, Defendant Union's picketing and other demonstrations were marked by threats, interference, force, trespass, confrontation, coercion, intimidation, and mass

picketing, resulting in menace to numerous persons and entities, in violation of O.C.G.A §34-6-1 *et seq.*

### 85.

The Defendant Union engaged in its illegal threats, interference, force, trespass, confrontation, coercion, intimidation, and mass picketing maliciously and with the intent to interfere with The Circle Group's contracts and/or relationships with its present customers.

### 86.

The Defendant Union engaged in its illegal threats, interference, force, trespass, confrontation, coercion, intimidation, and mass picketing maliciously and with the intent to interfere with The Circle Group's contracts and/or relationships with its prospective customers.

### 87.

The malicious, unjustified and intentional interference by the Defendant Union caused certain of The Circle Group's customers to terminate their relationships with the Circle Group, resulting in a loss of business and profits to the Circle Group.

88.

The Circle Group is entitled to compensatory and punitive damages for the Defendant Union's malicious and unjustified interference with its customers and business expectancies.

**COUNT III:  Trademark Infringment 15 U.S.C. § 1125(a)**

89.

Plaintiffs incorporate their allegations stated in paragraphs 1 through 88 of the Complaint as if fully restated herein.

90.

Since at least as early as July 14, 2000, Plaintiff has used the mark "CIRCLE GROUP" (the "Circle Group Mark") in connection with its specialty contracting services continuously and exclusively in commerce both within and outside the State of Georgia.

91.

Plaintiff is the owner of U.S. Trademark Application Serial Number 77/772,178 for the Circle Group Mark # for "Interior Contracting Services" in International Class 37, as well as the following URL web addresses that incorporates the Circle Group

Mark (www.thecirclegroup.com and www.thecirclegrouptruth.com; (the "Domain names").

92.

Since at least as early as July 14, 2000, Plaintiff has devoted considerable effort and resources to the development of goodwill and public recognition associated with the Circle Group Mark. As a result of the foregoing, Plaintiff is currently recognized as the top Wall/Ceiling Specialty contractor in the Southeastern United States by Southeast Construction Trade Magazine; and a Platinum Safety Award winner from the Association of Builders and Contractors. Plaintiff has diligently policed its rights in the Circle Group Mark to ensure the exclusivity of its use within the State of Georgia and to protect the goodwill therein.

93.

As a result of Plaintiff's continuous and exclusive use of the Circle Group Mark in commerce, and Plaintiff's significant investment in advertising, promotion and protection of the Circle Group Mark, the Circle Group Mark has acquired secondary meaning in the State of Georgia, whereby consumers have come to strongly identify the Circle Group Mark with Plaintiff as a source of specialty contracting services.

94.

Upon information and belief, on or about October 3, 2008, long after Plaintiff began using the Circle Group Mark, and long after the Circle Group Mark had acquired secondary meaning identifying Plaintiff as a source of specialty contracting services, the Defendant Union began using the Circle Group Mark in association with a planned and calculated campaign of wrongful acts against Plaintiff The Circle Group and its business conducted under the Circle Group Mark.

95.

To wit, the Defendant Union has made unauthorized use of the Circle Group Mark by, among other things, incorporating the Circle Group Mark in the Defendant Union's website (www.thecirclegrouptruth.info) as well as the Defendant Union's promotional and advertising materials containing false and misleading information regarding Plaintiff and Plaintiff's business operating under the Circle Group Mark.

96.

Thereafter on or about October 15, 2009, Plaintiff notified the Defendant Union that its use of the Circle Group Mark, or any variation thereof, violated Plaintiff's trademark rights.

Plaintiff requested Defendant to cease and desist its use of the Circle Group Mark and to respond to such demands immediately.

97.

Instead of discontinuing the misuse of the Circle Group Mark, the Defendant Union simply renamed its www.thecirclegrouptruth.info to www.thecirclegroupstinkx.info; which fails to cure the trademark infringement.

98.

Despite the best efforts of Plaintiff to resolve this matter amicably, the Defendant Union, with full knowledge of Plaintiff's rights in the Circle Group Mark, continues to use the Circle Group Mark in violation of Plaintiff's intellectual property right.

99.

The use of the valuable Circle Group Mark by the Defendant Union in connection with Defendant's unfair labor practices and in the stream of commerce on the internet is likely to cause confusion, mistake, and deception as to affiliation, connection, or association of Plaintiff with the Defendant Union.

100.

Upon information and belief, the Defendant Union did the aforesaid acts willfully, with knowledge and in disregard of Plaintiff's trademark rights.

101.

The Defendant Union's violation of Section 43(a) of the Latham Act, 15 U.S.C. § 1125(a) has caused Plaintiff irreparable injury and damage. Unless the Defendant Union is enjoined from continuing its unauthorized acts, Plaintiff will continue to be immediately and irreparably harmed.

**COUNT IV: Cybersquatting 15 U.S.C. § 1125(d)**

102.

Plaintiffs incorporate their allegations stated in paragraphs 1 through 101 of the Complaint as if fully restated herein.

103.

The use of the valuable Circle Group Mark by the Defendant Union (currently found at www.thecirclegroupstinkx.info) constitutes a bad faith intent to profit from Plaintiff's Circle Group Mark as it, inter alia, is likely to cause confusion,

mistake and deception as to affiliation, connection or association of Plaintiff with the Defendant Union.

104.

Upon information and belief, the Defendant Union did the aforesaid acts willfully, with knowledge and in disregard of Plaintiff's trademark rights.

105.

The Defendant Union's violation of 15 U.S.C. § 1125(d) has caused Plaintiff irreparable injury and damage. Unless the Defendant Union is enjoined from continuing its unauthorized acts, Plaintiff will continue to be immediately and irreparably harmed.

**COUNT V: Common Law Trademark Infringement**

106.

Plaintiffs incorporate their allegations stated in paragraphs 1 through 105 of the Complaint as if fully restated herein.

107.

By reason of the foregoing, the Defendant Union has engaged and is continuing to engage in acts of trademark infringement in violation of the common law of Georgia.

108.

On information and belief, the Defendant Union did the aforesaid acts willfully, with knowledge and in disregard of Plaintiff's rights therein.

109.

Unless the Defendant Union is enjoined from continuing its unauthorized acts, Plaintiff will continue to be immediately and irreparably harmed. The Defendant Union's trademark infringement has caused and will continue to cause financial damage to Plaintiff in an amount to be proven at trial.

**COUNT VI: Unfair Competition (O.C.G.A § 23-2-55 and Common Law)**

110.

Plaintiffs incorporate their allegations stated in paragraphs 1 through 109 of the Complaint as if fully restated herein.

111.

By reason of the foregoing, the Defendant Union has engaged and is continuing to engage in acts of unfair competition in violation of O.C.G.A. § 23-2-55 and the common law of Georgia.

112.

On information and belief, the Defendant Union did the aforesaid acts willfully, with knowledge and in disregard of Plaintiff's rights therein.

113.

Unless the Defendant Union is enjoined from continuing its unauthorized acts, Plaintiff will continue to be immediately and irreparably harmed. The Defendant Union's trademark infringement has caused and will continue to cause financial damage to Plaintiff in an amount to be proven at trial.

**COUNT VII: Deceptive Trade Practices (O.C.G.A § 10-1-371 et seq.)**

114.

Plaintiffs incorporate their allegations stated in paragraphs 1 through 113 of the Complaint as if fully restated herein.

## 115.

By reason of the foregoing, the Defendant Union has engaged and is continuing to engage in acts which violate the Uniform Deceptive Trade Practices Act as adopted by Georgia at O.C.G.A. § 10-1-371 *et seq*.

## 116.

On information and belief, the Defendant Union did the aforesaid acts willfully, with knowledge and in disregard of Plaintiff's rights therein.

## 117.

Unless the Defendant Union is enjoined from continuing its unauthorized acts, Plaintiff will continue to be immediately and irreparably harmed. Defendant's trademark infringement has caused and will continue to cause financial damage to Plaintiff in an amount to be proven at trial.

**COUNT VIII: INVASION OF PRIVACY (BY PLAINTIFF JOYCE LAIDLER)**

## 118.

Plaintiffs incorporate their allegations stated in paragraphs 1 through 117 of the Complaint as if fully restated herein.

119.

Plaintiff Joyce Laidler brings her claim for invasion of privacy under Georgia state law.

120.

The Court has supplemental jurisdiction over this claim pursuant to 28 U.S.C. § 1367.

121.

Plaintiff Joyce Laidler is an employee of The Circle Group. She is the mother of 3 children.

122.

In early December 2007, the Defendant Union erected a large sign across the street from the entrance to the Flynn Crossing Center. At that time, Joyce Laidler's 3 minor children were enrolled in day care at Legacy Academy, located on Flynn Crossing in Alpharetta, Georgia. Furthermore, The Circle Group was not performing any work at that shopping center or in the general area. The sign remained in place until early February 2008.

123.

The presence of the sign directly across the street from the daycare center was an offensive and unreasonable intrusion on the tranquility, well-being and privacy of Joyce Laidler and her minor children. The intrusion would be offensive to a reasonable person, and was considered offensive by Joyce Laidler and her minor children. Indeed, both Laidler and her children were extremely upset by the constant presence of the sign in an area they otherwise considered private.

124.

The Defendant Union had no legitimate purpose for placing the sign across from the daycare center. The Circle Group was not performing work at the daycare center or anywhere in the general area. The sign was clearly intended to intimidate and upset Joyce Laidler and her minor children, and succeeded in doing so.

125.

Joyce Laidler is entitled to recover damages from Defendant Union for the unreasonable intrusion on her seclusion.

**COUNT IX: Attorneys' Fees (O.C.G.A § 13-6-11)**

126.

Plaintiffs incorporate their allegations stated in paragraphs 1 through 125 of the Complaint as if fully restated herein.

127.

The Defendant Unions have acted in bad faith, been stubbornly litigious and caused Plaintiffs unnecessary trouble and expense.

128.

Plaintiffs are entitled to recover their costs of litigation, including attorneys' fees, pursuant to O.C.G.A. § 13-6-11.

**COUNT X: Punitive Damages (O.C.G.A.§ 51-12-5.1)**

129.

Plaintiffs incorporate their allegations stated in paragraphs 1 through 128 of the Complaint as if fully restated herein.

130.

The wrongful actions of the Defendant Union showed willful misconduct, malice, wantonness, oppression, and/or that entire

b) A judgment of compensatory and punitive damages for the Defendant Union's malicious and unwarranted interference with The Circle Group's business relations.

c) Injunctive Relief to prevent Defendant Union's continued violation of Plaintiff's trademark rights;

d) A judgment of compensatory and punitive damages for the Defendant Union's violation of Plaintiff's trademark rights found in 15 U.S.C. § 1125(a) and (d) and common law;

e) A judgment of compensatory and punitive damages for the Defendant Union's Unfair Competition and Deceptive Trade Practices;

f) A judgment of compensatory and punitive damages for the Defendant Union's unreasonable intrusion on Joyce Laidler's privacy;

g) A judgment for the attorneys' fees and costs of this action;

h) Such other further relief as this Court may deem proper.

Respectfully submitted this the 30th day of October, 2009.

James W. Wimberly, Jr.
Georgia Bar No.769800
Kathleen J. Jennings
Georgia Bar No. 394862

Wimberly, Lawson, Steckel,
Schneider & Stine, P.C.
Suite 400, Lenox Towers
3400 Peachtree Road, N.E.
Atlanta, Georgia 30326
(404)365-0900