**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| THE CIRCLE GROUP, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:09-CV-3039 |
| | ) | |
| | ) | |
| SOUTHEASTERN CARPENTERS | ) | |
| REGIONAL COUNCIL, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S**
**MOTION TO DISMISS**

COMES NOW Defendant Southeastern Carpenters Regional Council ("SCRC", or "Council"), and in support of its motion to dismiss, shows this Court the following:

## INTRODUCTION

Plaintiff Circle Group brings this action against the SCRC pursuant to Section 303 of the Labor-Management Relations Act, 29 U.S.C. § 187, for alleged "secondary boycott activity" in violation of 29 U.S.C. § 158(b)(4) (Count I); related federal trademark and "cybersquatting" claims (Counts III and IV); and related state law claims (Counts II, V-X), all arising from the same conduct. All of the conduct against which Circle's complaint is directed occurred during the course of the SCRC's "area standards" campaign conducted in Atlanta, Georgia since 2004. Complaint at p. 7. Specifically, Circle's claims are directed at 1) correspondence and communication from the SCRC to third

parties regarding its dispute with Circle and third parties doing business with Circle, and the object of the area standards campaign; 2) handbilling and "bannering" publicity informing the public about the area standards campaign; and 3) common situs picketing directed at Circle. The SCRC submits that it is entitled to judgment as a matter of law on Circle's secondary boycott claim arising from correspondence and communication to third parties, and arising from its bannering and handbilling activities. The SCRC also submits that it is entitled to judgment as a matter of law on Circle's federal trademark and cybersquatting claims. Further, Circle's state law claims are preempted by federal law. Finally, the SCRC is also entitled to judgment as a matter of law on Plaintiff Laidler's invasion of privacy claim.

## ARGUMENT

### I. Rule 12(b)(6) Standard

In reviewing a Rule 12(b)(6) motion to dismiss, the court must accept as true the well-pleaded allegations of the complaint and view them in the light most favorable to the plaintiff. Magluta v. Samples, 256 F.3d 1282, 1282 (11th Cir. 2001); Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367, 1370 (11th Cir. 1998). "Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." Neitzke v. Williams, 490 U.S. 319, 326 (1989), citing Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Conley v. Gibson, 355 U.S. 41, 45-46 (1957). "This procedure, operating on the assumption that the

factual allegations in the complaint are true, streamlines litigation by dispensing with needless discovery and factfinding." Ibid.

## II.  Circle's Section 303 Claim

### 1.  The Narrow Judicial Construction of Section 8(b)(4)(ii)(B)[1]

The Supreme Court has construed and applied the prohibitions of Section 8(b)(4)(ii)(B) narrowly.  "The NLRA does not contain a 'sweeping prohibition' of secondary activity, instead it 'describes and condemns specific union conduct directed to specific objectives." Burlington Northern R.R. Co. v. Brotherhood of Maint. of Way Employees, 481 U.S. 429, 449 (1987) (citation omitted).  "The prohibition of § 8(b)(4) is keyed to the coercive nature of the conduct, whether it is picketing or otherwise." NLRB v. Fruit & Vegetable Packers & Warehouseman (Tree Fruits), 377 U.S. 58, 68 (1964) (peaceful secondary picketing is not prohibited).  "More than mere persuasion is necessary to establish a violation of Section 8(b)(4)(ii)(B) . . . that section requires a showing of threats, coercion or restraints."  Moreover, those words are . . . 'nonspecific, indeed vague', and should be interpreted with 'caution' and not given a 'broad

---

[1]/Circle also pleads a Section 8(b)(4)(ii)(A) claim.  See Count I, Para.s 9-10. Section 8(b)(4)(ii)A), however, prohibits a labor organization from threatening, coercing or restraining entities engaged in commerce where "an object thereof is . . . forcing or requiring any person to join any labor . . . organization."  A Section 8(b)(4)(ii)(A) claim requires proof of an objective to have employees join a union or to obtain recognition of a union by an employer.  The entire thrust of Plaintiff's complaint, however, is stated in terms of the SCRC's alleged coercion of third parties to cease doing business with Circle, and not to force Circle employees to unionize.  The Complaint does not present a cognizable 8(b)(4)(ii)(A) claim.

sweep.'" Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Constr. Trades Council, 485 U.S. 568, 578 (1988), ("DeBartolo II"), quoting NLRB v. Drivers, 362 U.S. 274 (1960).

The courts have consistently applied the rule of NLRB v. Catholic Bishop of Chicago, 440 U.S. 490 (1979), to apply narrowly the prohibitions of Section 8(b)(4)(ii)(B). "Where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court construes the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." DeBartolo, 485 U.S. at 575-87 (applying Catholic Bishop to find no unlawful secondary boycott based on area standards handbilling urging boycott of third parties).

In a noteworthy 2007 decision, the D.C. Circuit Court of Appeals granted a union's petition for review and refused to enforce a decision of the NLRB finding the union's conduct violative of Section 8(b)(4)(ii)(B). Sheet Metal Workers, Local 15 v. NLRB, 491 F.3d 429 (D.C. Cir. 2007).[2] In so doing the D.C. Circuit relied on DeBartolo II's instruction "that the canon of

_____

[2]/The Eleventh Circuit affirmed an initial grant of a preliminary injunction in the underlying case, relying the finding of the NLRB Administrative Law Judge that the union had violated Section 8(b)(4)(ii)(B). Kentov v. Sheet Metal Workers, Local 15, 418 F.3d 1259, 1266 n. 8 (11th Cir. 2005). The D.C. Circuit on appeal rejected the ALJ and NLRB's findings, and removed that basis of the Eleventh Circuit's grant of the injunction. In light of the D.C. Circuit's decision, on October 23, 2007 the General Counsel of the NLRB concluded that the conduct did not constitute a violation of Section 8(b)(4)(ii)(B). See Ex. A, attached hereto.

constitutional avoidance is not suspended merely because a secondary boycott is at issue" and that "the National Labor Relations Act 'ought not to be construed to violate the Constitution if any other possible construction remains available.'" Id. at 437, quoting Catholic Bishop. See also, e.g., Benson v. United Brotherhood of Carpenters, Locals 184 and 1498, 337 F. Supp. 2d 1275, 1281 (D. Utah 2004) ("in view of the Court's conclusion that the NLRB has failed to establish reasonable cause . . . the court need not reach these difficult constitutional questions"); Kohn v. Southwest Regional Council of Carpenters, 289 F. Supp. 2d 1155, 1174-75 (C.D. Ca. 2003) ["DeBartolo II leads to the inevitable conclusion that the Court should avoid the serious First Amendment concerns . . . find that the union's bannering activity does not fall within the sphere of activity prohibited by § 8(b)(4)(ii)(B)]. (emph. in orig.).

## 2. The Applicable Statute of Limitations

Section 303 contains no statute of limitations; the federal courts borrow the most analogous state law statute of limitations. Prater v. UMWA, 793 F.2d 1201, 1209 (11th Cir. 1986). According to the Eleventh Circuit, a "§ 303 claim for damages resulting from the alleged secondary boycott activity is most analogous to state actions for 'injury to the period or rights of another not arising from contract'" (per Alabama law). Id. at 1210. The Georgia parallel is the two year statute established by Ga. Code Ann. § 9-3-33 for injuries to the person.

### 3. Common Situs Picketing and Threats to Picket

Circle's Section 303 claim in this case is based in part on the Council's communication or correspondence with third parties (including but not limited to the Council's "notice of labor dispute", or "warning letter"), informing them of the area standards campaign and possible publicity activities. Complaint, Para.s 12-13. The notice identifies Circle and notified recipients of the Council's intent to engage in publicity activities, including picketing. Ibid. "Common situs" picketing within the meaning of federal labor jurisprudence involves picketing at a site where two or more employers (one "primary", others "secondary") are engaged in normal business operations.

> "A union cannot use, or threaten to use, economic pressure against an employer with whom the union does not have a dispute for the purpose of getting the "secondary" employer to stop doing business with the "primary" employer - the employer with whom the union does have a dispute. A union may, however, picket the primary employer at a situs under the control of the secondary employer, as long as the picketing is primary in nature."

NLRB v. Ironworkers Local 433, 850 F.2d 551, 554 (9th Cir. 1988). To establish a violation of Section 8(b)(4)(ii)(B) with respect to common situs picketing, there must be proof that the union's actions had the secondary ***object*** of causing neutral parties to cease doing business with a the targeted employer. ***The union's intent, not the effect of the picketing, is determinative***. NLRB v. Int'l. Rice Milling Co., 341 U.S. 665, 672 (1951) (emph. supp.). The finding of lawful intent precludes the finding of a violation of Section 8(b)(4)(ii)(B),

regardless of what the effect of the picketing actually was, even if that effect was reasonably foreseeable. NLRB v. Teamsters Local 968, 225 F.2d 205, 209-211 (5th Cir.), cert. denied, 350 U.S. 914 (1955).

In Iron Workers Local 433, supra, the Ninth Circuit also addressed the issue of whether threats to conduct common situs picketing constitutes a Section 8(b)(4) violation. In that case the union told the neutral employer that it would picket and "***ensure that the non-union contractor (the primary employer) would be unable to do its work***." 850 F.2d at 555 (emph. supp.). The court concluded, despite the threat to effectively shut down the work of the primary, that

> "Section 8(b)(4) forbids secondary picketing, and the threat of secondary picketing. It does not reach informing secondary employers of, or 'threatening' them with, picketing of primary employers, including primary employers scheduled to work at a common situs."

Ibid. Further, the Ninth Circuit rejected the NLRB's finding that threats to picket must "affirmatively assure the secondary that picketing would be conducted within the (applicable legal) limitations, " finding that position to have no basis in statute or case law. Id. at 556. See also Plumbers Local 32 v. NLRB, 912 F.2d 1108 (9th Cir. 1990); Kim's Trucking Co., Inc. v. Teamsters Local 179, 132 F. Supp. 2d 715 (N.D. Ill. 1998). In its 2007 Sheet Metal Workers Local 15 decision, supra, the D.C. Circuit adopted the Ninth Circuit's "straightforward reasoning" that the Board 'could not presume that a union's

threat to picket the job was threat to picket contrary to law, when picketing at the job could be done in a lawful manner': we agree that 'such a presumption is without foundation in the Act, relevant case law or any general legal principles.'" 491 F.3d at 435-436, quoting Plumbers Local 32, supra.

### 4. Bannering and Handbilling

Circle alleges that the Council's handbilling and bannering activities also violate Section 8(b)(4). See, e.g., Complaint at Para.s 21-22. The banners utilized by the Council measured 20 feet x 4 feet, and read "Shame on (name of entity)" and "Labor Dispute." Ibid. Area standards bannering and handbilling activities by Carpenters affiliates has been the subject of much federal judicial and administrative litigation in recent years. Benson, supra; Kohn, supra; Overstreet v. Carpenters Local 1506, 409 F.3d 1506 (9th Cir. 2005); see also Carpenters Locals 184 & 1498 (Grayhawk Dev., Inc.), 2005 WL 195115 (2005); Carpenters Local 1506 (Sunstone Hotel Investors), 2005 WL 77044 (2005); Southwest Regional Council of Carpenters (New Star Gen. Contractors), 2004 WL 2671638 (2004); and Southwest Regional Council of Carpenters (Covi Concrete Constr., Inc.), 2004 WL 359075 (2004).[3] All of these cases stand for proposition that the bannering and handbilling activity of the type conducted by the Carpenters in Atlanta do not constitute a violation of Section 8(b)(4)(ii)(B).

---

[3]/Westlaw copies attached.

Further, these decisions admonish that the instruction of <u>Catholic Bishop</u> is to be adhered to in bannering cases. <u>See</u>, e.g., <u>Kohn</u>, 289 F. Supp. 2d at 1174-1175; <u>Benson</u>, 337 F. Supp. 2d at 1281; <u>New Star</u>, 2004 WL at 34 ("there is certainly an acceptable interpretation of the statute that avoids the constitutional questions and that is not plainly contrary to the intent of Congress"); <u>Sunstone Hotel Inv.s</u>, 2005 WL at 23 (ALJ "very mindful of the teachings of the Court in <u>DeBartolo II</u> that the Board must always review its definitions and analytical approach with a view to avoiding interpretations of the Act which conflict with constitutional protections"). In particular, the theory that the banners "might end up convincing the public to urge businesses not to hire (the employers) . . . is precisely the argument <u>DeBartolo II</u> rejected." <u>Benson</u>, 337 F. Supp. 2d at 1278 (emph. in orig.); <u>see also</u> <u>Kohn</u>, 289 F. Supp. 2d at 1166-1167 (Regional Director "concentrates his attention on the 'intent of the banner language' . . . this focus is troubling because it is directed not at the union members' conduct, but necessarily at the content of their message").

In adopting Section 8(b)(4)(ii)(B), Congress meant to bar only some, and not all, "actual" secondary picketing. "'A union can hand out handbills at the shop, can place advertisements in newspapers, can make announcements over the radio, and can carry on ***all publicity short of having ambulatory picketing in front of a secondary site***.'" <u>Benson</u>, 337 F. Supp. 2d at 1278 (emph. in orig.), <u>quoting</u> <u>DeBartolo II</u>, 485 U.S. at 587. <u>See also</u>, <u>Florida Gulf Coast Bldg. & Constr. Trades Council v. NLRB</u>, 796 F.2d 1328 (11th Cir. 1986),

aff'd. <u>sub</u>. <u>nom</u>. <u>DeBartolo II</u>; <u>Overstreet</u>, 409 F.3d at 1212.    "When Congress meant to bar picketing per se, it made its meaning clear; for example, § 8(b)(7) makes it an unfair labor practice 'to picket or cause to be picketed . . . any employer . . . .'  In contrast, the prohibition of § 8(b)(4) is keyed to the coercive nature of the conduct, whether it be picketing or otherwise." <u>Tree Fruits</u>, <u>supra</u>, 377 U.S. at 68.  "<u>Tree Fruits</u> (thus) makes untenable the notion that ***any*** kind of handbilling, picketing or other appeals to a secondary employer to cease doing business with the employer involved in the labor dispute is 'coercion' within the meaning of § 8(b)(4)(ii)(B) if it has some economic impact on the neutral." <u>DeBartolo II</u>, 485 U.S. at 579 (emph. in orig.).  Merely labeling the Council's banners as "picketing" does not support a Section 8(b)(4)(ii)(B) claim.

The <u>Sheet Metal Workers Local 15</u> decision is instructive.  That case involved not bannering, but a "mock funeral" at a hospital combined with handbilling.  491 F.3d at 432.  The court described the mock funeral as a "combination of street theater and handbilling", "somewhere between the lawful handbilling in <u>DeBartolo</u> and unlawful picketing or patrolling." <u>Id</u>. at 438. Concluding that the union's conduct was not picketing, the court addressed whether it was coercive within the meaning of Section 8(b)(4)(ii)(B).  The court found no violation. <u>Id</u>. at 437-439.

### 5. The Council's Threats to Picket, and Bannering/Handbilling are Lawful, and Cannot Form the Basis for Finding a § 8(b)(4) VIolation

The correspondence and other communications to third parties, and the bannering and handbilling activity of Carpenter affiliates in <u>Overstreet</u> , Benson and other recent cases were the same type utilized in the same manner by the Carpenters in Atlanta.  Indeed, in <u>Overstreet</u> the Carpenters also used a banner ("Don't Eat at [name of secondary restaurant]") promoting a boycott.  As noted by the Ninth Circuit,

> "As in <u>DeBartolo</u>, the Carpenters' bannering does not involve patrolling in front of an entrance way and therefore erects no symbolic barrier on front of the Retailers' doorways.  Nor did the Carpenters place their banners so as to create any physical barrier blocking the entrances to the Retailers or the walkways approaching those entrances.  Nor is there anything about the Carpenters' members' behavior that could be regarded as threatening or coercive - no taunting, no massing of a large number of people, no following of the Retailers' patrons."

409 F.3d at 1211.  The Ninth Circuit reviewed the contention of the NLRB that the bannering justified a preliminary injunction in support of an allegation that Section 8(b)(4)(ii)(B) was violated because the Carpenters "threatened, coerced or restrained a person engaged in commerce."  <u>Id</u>. at 1212.  The court affirmed the District Court's denial of an injunction on the grounds that the bannering did not constitute proscribed picketing or signal picketing, nor employ "fraudulent" language suggesting that the Carpenters had a labor dispute with the secondary parties.  <u>Id.</u> at 1212-1219.  The same conclusion is required

regarding the same conduct here.  See also Benson, Kohn, Grayhawk Dev.,
Sunstone Hotel Investors, New Star Gen. Contractors, and Covi Concrete
Constr., Inc.. supra.

Not only is the Council entitled to judgment as a matter of law for any
claim based on the threats to picket and bannering activity, but allegations
based on that must be segregated from other Section 8(b)(4) allegations in this
case.  Again, the statute does not prohibit all secondary activity.  Section 8(b)(4)
"describes and condemns specific union conduct directed to specific
objectives"; only prohibited secondary activity having a prohibited object is
unlawful.  Carpenters Local 1976, 357 U.S. at 98.  Even threats and coercion
are entirely lawful unless combined with an unlawful object.  Thus, the Court
should not consider lawful conduct as evidence regarding allegedly unlawful
conduct without limitation, thus impermissibly blurring the lines between the
two, inconsistent with relevant authority.  Moore Dry Dock[4] and its progeny
clearly require separate consideration of separate events in order to establish
whether each is lawful or unlawful.  See, e.g., SEIU Local 525 (Gen'l. Maint.
Svc. Co.), 329 NLRB 638, 681 (1999) ("the Board has posited that handbilling
is not to be regarded as coercive simply because picketing either precedes or
follows it, even where no hiatus occurs between the two"), citing C.D.G., infra;
Newark Morning Ledger Co. (SEIU Local 32B-32J), (ALJ Decision), 1993

---

[4] Sailors Union of the Pacific (Moore Dry Dock), 92 NLRB 547 (1950).

NLRB LEXIS 892, *16-18[5] (handbilling not coercive even if it shared same objective as earlier ambulatory picketing); <u>Laborers Local 332 (C.D.G., Inc.)</u>, 305 NLRB 298 (1991) (handbilling unaccompanied by other coercive conduct not unlawful, even though it occurred on the same day as conduct found unlawful, including mass picketing and blocking of entrances for 30 minutes).

Moreover, consideration of lawful bannering, handbilling and the Council's warning letter as evidence to find unlawful conduct is illogical, and runs afoul of the Supreme Court's mandate that lawful conduct cannot be the basis for damages.  In <u>NAACP v. Claiborne Hardware</u>, 458 U.S. 886 (1982), the Court explained that

> "This Court has often recognized that the activity of peaceful pamphleteering is a form of communication protected by the First Amendment. . . .  The claim that the expressions were intended to exercise a coercive impact on respondent does not remove them from the reach of the First Amendment. Petitioners plainly intended to influence respondent's conduct by their activities; this is not fundamentally different from the function of a newspaper.  Petitioners were engaged openly and vigorously in making the public aware of respondent's real estate practices. Those practices were offensive to them, as the views and practices of petitioners are no doubt offensive to others.  But so long as the means are peaceful, the communication need not meet standards of acceptability."

<u>Id</u>. at 910-911, <u>quoting</u> <u>Organization for a Better Austin v. Keefe,</u> 402 U.S. 415, 419 (1971).  "Speech does not lose its protected character . . . simply

---

[5]/Lexis copy attached.

because it may embarrass others or coerce them into action." 458 U.S. at 910. Even where speech is accompanied by some violence, it nonetheless retains its First Amendment protection. "The right of free speech cannot be denied by drawing from a trivial rough incident or a moment of animal exuberance the conclusion that otherwise peaceful picketing has the taint of force." Id. at 924. The Court's conclusion was that "the use of speeches, marches, and threats of social ostracism cannot provide the basis for a damage award." Id. at 933.

As demonstrated supra, it is clear that handbilling, bannering and the Council's warning letters are protected activities. DeBartolo; Overstreet; Benson; Kohn. The First Amendment precludes a recovery of damages based on protected conduct. Clairborne, supra.

### 6. Circle Cannot Rely on Acts Outside the Statute of Limitations

Just as Circle cannot rely on evidence of lawful conduct by the Council to support any claim for damages under Section 303, it cannot rely on evidence of conduct outside the two-year limitations period. Yes, as a basis for its claims Circle relies on acts well outside the limitations period. See, e.g., Complaint Para. 16 and Ex.s B, C & D hereto (hundred, screaming, and/or nasty picketers refers to events of 2004); Para. 20 and Ex. E hereto (large poster with "Rat" jobs in 2005); Para. 25 and Ex. F hereto (Colony Square injunction June 28, 2004); Para.s 32-33 and Ex.s G and H hereto (paraphrases of 2005 news article and internal report). The applicable statute of limitations borrowed from Georgia law for a Section 303 claim is two years. Prater v. UMWA, 793 F.2d at

1209; Ga. Code Ann. § 9-3-33.  Even assuming arguendo that they relate in any way to Circle, events pre-dating October 2007 are irrelevant to this case.

### III.  Circle's Lanham Act Counts Fail to State Claims

Circle asserts two claims for damages and injunctive relief under the federal Lanham Act: trademark infringement in violation of 15 U.S.C. § 1125 (a), and cybersquatting in violation of 15 U.S.C. § 1125 (d).  Both Lanham Act counts are due to be dismissed for failure to state actionable claims.

### 1.  Circle Fails to State a Claim of Federal Trademark Infringement

In Count III of its Complaint, Circle alleges that it is owner of the "mark" "Circle Group,"[6] which Circle claims has acquired secondary meaning in the State of Georgia because consumers have "come to strongly identify the Circle Group Mark with plaintiff as a source of specialty contracting services." Complaint, Para.s 91, 93.  Circle alleges that the Council has made unauthorized use of the "Circle Group" mark by incorporating the mark in its website www.thecirclegrouptruth.info, and in its "promotional and advertising materials containing false and misleading information regarding Plaintiff and Plaintiff's business."  Id. at Para. 95.  Circle further alleges that the Council's use of the "Circle Group" mark in the "stream of commerce on the internet is

---

[6]  "The Circle Group" is not a registered trademark.  Circle submitted an application to the U.S. Patent and Trademark Office signed July 1, 2009, a copy of which is attached hereto as Ex. I.

likely to cause confusion, mistake, and deception" as to Circle's association and connection with the Council. Id. at Para. 99.

Circle's federal claims of infringement on its unregistered trademark are brought pursuant to15 U.S.C. § 1125(a) which provides, in relevant part, as follows:

> (a) Civil action
> (1) Any person who, **on or in connection with any goods or services**, or any container for goods, **uses in commerce** any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which –
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

(emph. supp.).

To invoke the protections of the Lanham Act, Circle must show that the Council used Circle's mark "in connection with any goods, services, or commercial activities." Id. This is commonly referred to as the "commercial

use" requirement. Commercial use, in this context, refers simply to one person's use of another's mark to sell or market goods or services. Commercial use does not encompass use of an owner's mark to criticize the owner's goods or services. See Utah Lighthouse Ministry v. Foundation for Apologetic Information and Research, 527 F.3d 1045, 1052 (10th Cir. 2008).

The Lanham Act is intended to "protect the ability of consumers to distinguish among competing producers." Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 774 (1992). As the Tenth Circuit noted in Utah Lighthouse [also a § 1125(a) case], trademark rights cannot be used "to quash an unauthorized use of the mark by another who is communicating ideas or expressing points of view." 527 F.3d at 1052-1053, quoting L.L. Bean, Inc., v. Drake Publishers, Inc., 811 F.2d 26, 29 (1st Cir. 1987). The Supreme Court has made it clear that trademark infringement law prevents only unauthorized uses of a trademark in connection with a commercial transaction in which the trademark is being used to confuse potential customers about which party is the actual source of goods and services. Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co., 316 U.S. 203, 205 (1942); see also Bihari v. Gross, 119 F.Supp.2d 309, 318 (S.D.N.Y. 2000) (holding that the "in connection with any goods or services" clause in § 1125 (a)(1) imposes a "commercial use" requirement parallel to that set forth in § 1125 (c)).

In this case, Circle does not even allege that the Council is engaged in the sale of marketing or goods or services. In the Complaint, Circle correctly

asserts that the Council is a "labor organization … engaged in this judicial district in representing or acting for employee members for the purpose of collective bargaining."  Complaint, Para. 5.  At most, Circle alleges that the Council used the Circle Group mark in "promotional and advertising materials" and "in the stream of commerce on the internet."  <u>Id</u>. at Para.s 5, 99.

Federal courts have rejected the argument that a trademark owner must only show that a defendant's use is "in commerce" for coverage under this section.  <u>See</u> <u>Bosley Med. Inst., Inc. v. Kremer</u>, 403 F.3d 672, 667 (9th Cir. 2005) ("the statutory phrase "use in commerce" is only a requirement for Congress to enact legislation concerning trademarks").  Furthermore, Circle does not (and cannot) assert that the Council's website "www.circlegrouptruth.net" (or now, "www.circlegroupstinkx.info") provides any goods or services, earns any revenue, or has any direct links to any commercial sites.  <u>See</u> <u>Utah Lighthouse</u>, 527 F.3d at 1052.  Circle may refer to Council publications referencing Circle Group as "promotional and advertising materials", but nowhere in the Complaint does Circle allege that it is promoting or advertising its own goods services.  Rather, every alleged reference the Council made to Circle in print or on its website was in connection with the Council's labor dispute with the company.  As the Second Circuit has held, "trademark infringement protects only against mistaken ***purchasing decisions*** and not confusion generally."  <u>Lang v. Ret. Living Publishing Co., Inc</u>. 949 F.2d 576, 583 (2d Cir. 1991) (emph. supp.).

Consistent with application of the "commercial use" requirement to § 1125(a), several district courts have dismissed trademark infringement claims where, as here, a union defendant was allegedly using an employer's trademark in disseminating critical information about an employer during the course of a labor dispute.  See <u>Cintas Corp., et al., v. Unite Here, et al.</u>, 601 F.Supp.2d 571 (S.D.N.Y. 2009); <u>Sedexho v. HERE Local 217</u>, 989 F.Supp. 169, 172 (D.Conn. 1997); <u>WHS Entertainment Ventures v. United Paperworkers Int'l Union</u>, 997 F.Supp 946, 949-951 (M.D.Tenn. 1998); <u>Cellco Partnership v. Communications Workers of America</u>, 2003 WL 25888375 at *8 n. 6 (D.N.J. 2003)[7] (in Lanham Act suit by employer against a union that used the employer's trademarked slogan as part of a corporate campaign, the court noted that a "union commenting on its employer adversary through using the latter's slogan during a labor dispute" is exercising "its First Amendment right," should not be "jeopardized by an overly-broad construction of the Lanham Act").  The Council's use of Circle's  unregistered trademark "Circle Group"  is not in connection with any goods or services, and therefore Circle's claims pursuant to § 1125(a) should be dismissed.

### 2.   Circle Fails to State a Claim of "Likelihood of Confusion" Provision of § 1125(a)(1)A

Even if the Council's use were determined to be commercial, it would only infringe upon Circle's trademark rights if the use created a likelihood of

---

[7]/Westlaw copy attached.

confusion.  To establish a trademark infringement claim under § 1125 (a)(1)(A),

Circle must meet a second requirement that the Council's use of its mark is

likely to cause confusion as to the affiliation, connection, or association of

defendant with plaintiff, or as to the origin, sponsorship, or approval of the

defendant's goods, services, or commercial activities by Plaintiff.  Cintas Corp.,

601 F.Supp.2d at 578.

The Eleventh Circuit uses a seven-factor test in assessing whether a

likelihood of confusion exists: (1) type of mark; (2) similarity of mark; (3)

similarity of the products the marks represent; (4) similarity of the parties' retail

outlets (trade channels) and customers; (5) similarity of advertising media; (6)

the defendant's intent; and (7) actual confusion.  See Frehling Enterprises, Inc.

v. International Select Group, Inc., 192 F.3d 1330, 1335 (11th Cir.1999).

Although Circle contends that Defendant uses of "Circle Group" in the domain

name of a website and in written materials critical of The Circle Group's labor

practices, it is plain from the allegations in the Complaint that Circle does not

meet the confusion requirement.

The factors relevant to this case weigh heavily in the Council's favor.

First, "circlegroupstinkx.info" and "circlegrouptruth.info" are readily

distinguishable from "thecirclegroup.com," Circle's business website.[8]

Defendants are not using "Circle Group" as a "source identifier", but rather

_____

[8]  Circle operates a business website at www.thecirclegroup.com, as well as an
anti-union website at www.thecirclegrouptruth.com.  Ex. A, p. 12.

solely to criticize The Circle Group's labor practices.  <u>Cintas</u>, 601 F.Supp.2d at 579; <u>citing</u> <u>United We Stand Am., Inc. v. United We Stand Am. N.Y., Inc.</u>, 128 F.3d 86, 92-93 (2d Cir. 1997) (noting there is no justification for relief under § 1125(a) when "the defendant's … use[e] plaintiff's mark not in a manner that would create confusion as to the source, but rather as part of a message whose meaning depend[s] on reference to plaintiff's product").  While Defendant's website and written materials may disparage Circle, the likelihood that actual or potential customers of Circle would be confused about who provides Circle Group's services is nil.  The Council does not sell or offer products or services; there is no overlap between Circle's operations ("interior construction/drywall installation") and Defendant's operations ("representing or acting for employee members for the purpose of collective bargaining").  Complaint, Para.s 5, 8.

Nor does Circle allege any effort by Defendant to associate itself with The Circle Group.  Rather, the Complaint alleges that Defendant's efforts are directed at attacking Circle for allegedly unlawful purposes.  Based on the Complaint's description of Council activities, Circle's customer base - building managers, leasing agents, tenants, and particularly general contractors in the Atlanta area - are familiar with the Council and are not likely to be confused about its relationship to The Circle Group.  <u>See</u> <u>Complaint</u>, para.s 11-38.  Given the nature of the labor dispute as alleged by Circle, and the distinction between their purposes and their missions, the likelihood of confusion among customers

caused by the Council's written materials and website regarding the labor dispute is implausible.

### 3. Circle Fails to State a Claim Under the "Commercial Advertising or Promotion" Provision of § 1125 (a)(1)(B)

The "commercial advertising or promotion" language of § 1125(a)(1)(B) was added by Congress to ensure that the section would not be applied to political speech. <u>Amer. Needle & Novelty v. Drew Pearson Marketing</u>, 820 F.Supp. 1072, 1077 (N.D.Ill. 1993). Accordingly, in order for the Council's representations to constitute "commercial advertising or promotion" under § 1125(a), they must be (1) commercial speech; (2) by a defendant who is in commercial competition with plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services; and (4) must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry. <u>Sodexho</u>, 989 F.Supp. at 171-172; <u>citing Gordon & Breach Science Publishers v. AIP</u>, 859 F.Supp. 1521, 1536 (S.D.N.Y. 1994). Circle's Complaint alleges none of the required elements. "The mere desire to exert economic pressure on a company … does not transform defendants' action into commercial speech, or make the defendants commercial competitors of plaintiff." <u>Id</u>. at 173.

### 4. The Council's Use of www.circlegrouptruth.info or www.circlegroupstinkx.info as a Domain Name Does Not Constitute "Cybersquatting"

In 1999, Congress passed the Anti-Cybersquatting Protection Act ("ACPA") as an amendment to the Lanham Act to prohibit "cybersquatting." "Cybersquatting" occurs when a person other than the trademark holder registers the domain name of a well known trademark and then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder. See Sporty's Farm L.L.C. v. Sportsman's Market, Inc., 202 F.3d 489 493 (2d Cir.2000). A trademark owner asserting a claim under the ACPA must establish the following: (1) it has a valid trademark entitled to protection; (2) its mark is distinctive or famous; (3) the defendant's domain name is identical or confusingly similar to, or in the case of famous marks, dilutive of, the owner's mark; and (4) the defendant used, registered, or trafficked in the domain name (5) with a bad faith intent to profit. Ford Motor Co. v. Catalanotte, 342 F.3d 543, 546 (6th Cir.2003). Circle's Count IV fails to establish all of the required element.

The domain name "www.thecirclegroupstinkx.info" is not "identical" or "confusing similar" to Circle's unregistered mark. By adding "stinkx" the Council has made it clear to users that Circle does not sponsor the site because the domain name connotes adverse scrutiny of the company. See Bally Total Fitness v. Faber, 29 F.Supp.2d 1161, 1164 (C.D.Cal. 1998) ("ballysucks.com"

not confusingly similar to "Bally"); <u>Lucent Technologies, Inc., v.
Lucentsucks.com</u>, 95 F.Supp.2d 528, 535 (E.D.Cal. 2000). To prohibit internet
critics of companies from identifying the subject of their website's criticism
would isolate them from most internet users. <u>Bihari</u>, 119 F.Supp.2d at 232;
<u>citing</u> <u>Bally Total Fitness</u>, 29 F.Supp.2d at 1165. "Searchers would have a
much more difficult time locating relevant websites if they could do so only by
correctly guessing the long phrases necessary to substitute for trademarks."
<u>Welles v. Playboy Enterprises</u>, 279 F.3d 796, 804 (9th Cir. 2002). Likewise, the
Council would have no avenue for effectively criticizing The Circle Group
without referring to it by name. "Much useful social and commercial discourse
would be all but impossible if speakers were under threat of an infringement
lawsuit every time they made reference to a person, company or product by
using its trademark." <u>CPC International v. Skippy, Inc</u>., 214 F.3d 456, 462 (4th
Cir. 2000).

Aside from the obviously critical nature of the Council's
"circlegroupstinkx.info," it is distinguishable from Circle's domain names in
several other ways. The Council's domain name is not identical to Circle's, and
requires additional keystrokes for consumers trying to access the Circle's
website. Any third-party website that is different in some way from "[name of
company].com" will be presumed by consumers not to be the company's site.
"In the Internet context, consumers are aware that domain names for different
websites are often quite similar, because of the need for language economy, and

that very small differences matter." Entrepreneur Media, Inc. v. Smith, 279
F.3d 1135, 1147 (9th Cir. 2002). Furthermore, the use of ".com" has been found
to connote commercial use. Panavision International v. Toeppen, 141 F.3d
1316, 1327 (9th Cir. 1998). In contrast, Defendant's use of ".info" distinguishes
it from Circle's websites while signaling that it is not a traditional business
website.

Count IV also fails to meet § 1125(d)'s requirement that the defendant
registered mark with a "bad faith intent to profit" from the domain name. The
10th Circuit explained the bad faith requirement in its Utah Lighthouse decision:

> "[B]ad faith intent to profit is when a defendant
> purchases a domain name very similar to the
> trademark then offers to sell the name to the trademark
> owner at an extortionate price. A defendant could also
> intent to profit by diverting customers … to the
> defendant's own website … [to] purchase the
> defendant's products or services instead of the
> trademark owners's."

527 F.3d at 1058. Neither of these purposes is alleged in the Complaint.
Therefore, Circle's cybersquatting claim must be dismissed because its
allegations are insufficient to establish that the parties' domain names are
confusingly similar and that Defendant registered domain names with a bad
faith intent to profit.

### 5. Circle is not Entitled to Injunctive Relief

The Norris-LaGuardia Act, 29 U.S.C. §§ 101 et seq., provides that federal
courts lack jurisdiction to issue injunctions in cases "involving or growing out

of a labor dispute."  29 U.S.C. § 101; <u>Burlington Northern</u>, 481 U.S. at 437.

The term "labor dispute" includes the following:

> "any controversy concerning terms or conditions of
> employment, or concerning the association or
> representation of persons in negotiating, fixing,
> maintaining, changing, or seeking to arrange terms or
> conditions of employment, regardless of whether or
> not the disputants stand in the proximate relation of
> employer and employee."

29 U.S.C. § 113 (c); <u>see also</u> <u>Marine Cooks & Stewards v. Panama</u>, 362 U.S.

365, 369 (1960) ("The [Norris-LaGuardia] language is broad because Congress

was intent upon taking the federal courts out of the labor injunction

business…").  Federal courts have interpreted "labor dispute" broadly to cover a

wide variety of union activity, including activity in furtherance of an area

standards campaign and secondary activity, as alleged by Circle.  <u>See</u>, e.g

<u>Burlington Northern RR</u>, 481 U.S. 429; <u>Altemose Constr. Co., v. Atlantic, Cape</u>

<u>May and Parts of Burlington, Ocean and Cumberland Counties Building Trades</u>

<u>Council, et al.</u>, 493 F.Supp. 1181 (D.C.N.J. 1980).  Furthermore, Norris-

LaGuardia applies to federal trademark suits for injunctive relief arising from

labor disputes.  <u>See</u> <u>Marriott Corp.., v. Great America Services Trades Council</u>,

552 F.2d 176, 179-180 (7th Cir. 1977); <u>Lucky Stores v. Teamsters</u>, 812 F.Supp.

162, 163 (N.D. Cal. 1992); <u>Senco Products, Inc. v. Electrical Workers</u>, 311

F.Supp. 590, 591-592 (S.D. Ohio 1970).  Circle's claim for injunctive relief

under the Lanham Act is due to be dismissed.

**IV. Circle Fails to State Claims of Georgia Common Law Trademark Infringement and Unfair Competition**

Like its claims under § 1125(a) and (d) of the Lanham Act, Circle's state law trademark and Georgia's Unfair and Deceptive Trade Practices Act claim also require a showing of likelihood of confusion. The Board of Regents of the University System of Georgia v. Buzas Baseball, Inc., 176 F.Supp.2d 1338, 1351 (N.D.Ga. 2001); citing Ackerman Security Systems, Inc. v. Design Security Systems, 201 Ga.App. 805 (1991). As noted supra, Circle has failed to make out a valid claim of likelihood of confusion under the Eleventh Circuit test. Furthermore, because Circle's federal trademark claims are due to be dismissed for the reasons cited, this Court should decline to exercise supplemental jurisdiction over Circle's state law claims pursuant to 28 U.S.C. § 1367(c)(3). See Michael Linet, Inc. v. Village of Wellington, Fla., 408 F.3d 757, 763 (11th Cir. 2005); Hayden v. Coppage, 533 F.Supp.2d. 1186, 1199 (M.D.Ala. 2008).

**V. Circle's State Law Claims are Preempted**

As noted, Circle's Section 303 claim arises from Section 8(b)(4) of the NLRA. In San Diego Building Trades Council v. Garmon, 359 U.S. 236 (1959), the U.S. Supreme Court established what is now known as "Garmon preemption." The Court held that

> "when it is clear or may fairly be assumed that the
> activities which a State purports to regulate are
> protected by Section 7 of the (NLRA), or constitute an

> unfair labor practice under Section 8, due regard for
> the federal enactment requires that state jurisdiction
> must yield.  To leave the States free to regulate
> conduct so plainly within the central aim of federal
> regulation involves too great a danger of conflict
> between power asserted by Congress and requirements
> imposed bg state law.  Nor has it mattered whether the
> States have acted through laws of broad general
> application rather than laws specifically directed
> towards the governance of industrial relations.
> Regardless of the mode adopted, to allow the States to
> control conduct which is the subject of national
> regulation would created potential frustration of
> national purposes."

<u>Garmon</u>, 359 U.S. at 244.  According to the Supreme Court, state courts are to

defer to the National Labor Relations Board (the federal agency which

administers and enforces the NLRA) in interpreting federal labor law.  If the

NLRB has determined that the conduct in question is covered by Section 7 and

Section 8 of the NLRA, then the state court lack jurisdiction.  Even if the NLRB

has made no such determination, state court jurisdiction is still preempted if the

conduct in question is <u>*even **arguably** protected or prohibited by*</u> the NLRA.  <u>Id.</u>

at 246.  The Supreme Court went on to note that, even if the state court cause of

action provides different or greater remedies than those available under the

NLRA, the state court nevertheless lacks jurisdiction.  <u>Id.</u> at. 247.  The fact that

a common law or state regulatory scheme provides for compensatory or punitive

damages (which the NLRA cannot) does not defeat preemption: "since remedies

form an ingredient of any integrated scheme of regulation, to allow the State to

grant a remedy here which has been withheld from the (NLRB) only accentuates the danger of conflict." Garmon, 359 U.S. at 247.

Five years after Garmon the Supreme Court found that Section 303 is among the federal labor statutes that "occupies an area of judicial decision within which the policy of the law is so dominated by the sweep of federal statutes that legal relations which they affect must be deemed governed by federal law having its source in those statutes, rather than by local law." Teamsters Local 20 v. Morton, 377 U.S. 252, 261 (1964). Following Garmon and Morton, federal courts have found Section 303 to completely preempt state law claims arising from conduct arguably prohibited by Section 8(b)(4). In Smart v. IBEW Local 702, 562 F.3d 798 (7th Cir. 2009), the Seventh Circuit found that "section (303) completely preempts state law claims related to secondary boycott activities described in section [8(b)(4)]; it provides an exclusive cause of action for the redress of such illegal activity." Id. at 808. In BE&K Constr. Co. v. Carpenters, 90 F.3d 1318 (8th Cir. 1996), the Eighth Circuit, citing Morton, found that "when Congress enacted Section 303 it occupied the field of regulation of secondary activities and closed it to state regulation." Id. at 1328.

To the extent Circle may attempt to distinguish Section 303 preemption from the field of "complete preemption" in federal labor law, it is clear that any recognized exceptions are narrow. In Local 926, IUOE v. Jones, 460 U.S. 669 (1983), the Supreme Court reaffirmed its approach that if the conduct at issue is

arguably prohibited or protected by the NLRA, "otherwise applicable state law and procedures are ordinarily preempted." 460 U.S. at 676. The only exception is when "the conduct at issue is only a peripheral concern of the Act or touches on interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, it could not be inferred that Congress intended to deprive the state of the power to act . . . ." <u>Ibid</u>. The limited exceptions to the reach of <u>Garmon</u> preemption include behavior "so extremely intimidating, destructive or violent as to threaten the domestic peace or to earn the epithet 'outrageous'", or "conduct marked by violence and imminent threats to the public order." <u>Garmon</u>, 359 U.S. at 247-248. Thus, it is only claims arising from violent mass picketing and the effects thereof (such as trespass or intentional infliction of emotional distress) may not be preempted. <u>Sears, Roebuck & Co.v. Carpenters</u>, 436 U.S. 180 (1978); <u>Farmer v. Carpenters</u>, 430 U.S. 290 (1977); <u>UAW v. Russell</u>, 356 U.S. 634 (1958). Circle brings no such causes of action in this case. The state law torts it does plead, involving alleged loss to or interference with its business interests, are preempted. <u>See</u>, e.g., <u>Story</u>, <u>BE&K</u>, <u>supra</u>; <u>Labor Ready Mid-Atlantic v. Tri-State Bldg. & Constr. Trades Council</u>, ___ F. Supp. 2d ___, 168 LRRM (BNA) 2642 (S.D. W. Va. Sept. 21. 2001); <u>Brawn v. Coleman</u>, 167 F. Supp. 2d 145 (D. Mass. 2001).

## VI.  Count VIII Fails to State a Claim

Count VIII of the Complaint is Plaintiff Laidler's invasion of privacy claim, inserted in this case pursuant to the Court's supplemental jurisdiction.

Complaint at para. 120.  The entire substance of the claim is that Ms. Laidler is a mother of three, and that the Council conducted bannering ("erected a large sign") near the entrance to a shopping complex which houses the day care attended by the children.  Complaint, Para.s 121-122.  The facts alleged do not state a claim for invasion of privacy under Georgia law.

The Georgia courts recognize four invasion of privacy torts: intrusion upon seclusion or into private affairs; public disclosure of embarrasing private facts; false light publicity; and appropriation of likeness for business advantage. <u>Yarbray v. Southern Bell Tel. & Tel. Co.</u>, 409 S.E.2d 835 (Ga. 1991).  The only one of these claims conceivably implicated by Ms. Laidler's bare allegations is intrusion upon seclusion.  The only allegation, however, is that the banner was posted near the shopping center; she does not inform the Court was on the banner; she does not allege that any persons accompanied the banner, or if so, that any such persons watched her or directed any remarks to her.

To be actionable, alleged intrusion into seclusion must assert a claim of overt and extended surveillance conducted in a vicious or malicious manner. <u>Ellenberg v. Pinkerton's, Inc.</u>, 202 S.E.2d 701 (Ga. 1973); <u>Pinkerton v. Stevens</u>, 132 S.E.2d 119 (Ga. 1963).  The type of conduct found actionable includes, for example, stalking and harassing (armed or otherwise), watching an individual "for hours", accompanied by hostile remarks to the target or third parties about the target.  <u>Summer v. Bailey</u>, 55 F.3d 1564, 1565-1566 (11th Cir. 1995).  Ms.

Laidler's allegations do not rise to the level of actionable conduct under Georgia law.[9]

WHEREFORE, based on the above and foregoing, Defendant SCRC respectfully submits that its motion to dismiss is due to be granted, and that an appropriate order should follow.[10]

Respectfully submitted,


___s/ Robert M. Weaver____
Robert M. Weaver, Esq.
Georgia Bar No. 558537

Nakamura, Quinn, Walls,
     Weaver & Davies LLP
Suite 380. 2700 Highway 280 East
Birmingham, AL 35223
205/870-9989
205/803-4143
rweaver@nqwlaw.com

___s/ Tessa A. Warren_____
Tessa A. Warren, Esq.
Georgia Bar No. 435157

Nakamura, Quinn, Walls,
     Weaver & Davies LLP
3516 Covington Highway
Decatur, GA 30032
404/299-1211
404/299-1288
twarren@nqwlaw.com

---

[9]/Counts IX and X seek an award of punitive damages and attorney's fees. Because the only viable claim in this case is Circle's Section 303 claim based on common situs picketing, it is not entitled to punitive damages or an award of attorney's fees. Morton, supra, 377 U.S. at 260 (punitive damages); Capeletti Bros. v. IUOE Local 487, 514 F,2d 1239 (5th Cir. 1975 )( attorney's fees).

[10]/Defense counsel certifies that this pleading was prepared with one of the font and point selections approved by the Court in Local Rule 5.1.

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that the foregoing has been served on the following parties by means of the Court's CM/ECF systems this the 4th day of February 2010:

James W. Wimberly, Jr., Esq.
Kathleen Jean Jennings, Esq.
Wimberly, Lawson, Steckel, Schneider & Stine, PC
Suite 400, 3400 Peachtree Road, NE
Atlanta, GA 30326

___s/ Robert M. Weaver_____
Robert M. Weaver