## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| THE CIRCLE GROUP, L.L.C. and JOYCE LAIDLER,<br><br>                    **Plaintiffs,**<br><br>    **v.**<br><br>THE SOUTHEASTERN CARPENTERS REGIONAL COUNCIL, OF THE UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA,<br><br>                    **Defendant.** | **1:09-cv-3039-WSD** |

## OPINION AND ORDER

This matter is before the Court on The Southeastern Carpenters Regional Council, of the United Brotherhood of Carpenters and Joiners of America's ("Defendant" or "Union") Motion for Summary Judgment [100], The Circle Group, L.L.C.'s ("Plaintiff" or "Circle Group") Partial Motion for Summary Judgment as to Liability [101], Plaintiff's Objections to Certain Statements of Undisputed Facts and Declaration Statements [112], Defendant's Motion to Strike Plaintiff's Reply to Defendant's Response to the Plaintiff's Statement of

Undisputed Material Facts [117], Plaintiff's Motion to File Substituted Appendix

[119], and Defendant's Motion to Quash Subpoena to Produce Documents [127].[1]

## I.    BACKGROUND[2]

The Southeastern Carpenters Regional Council, of the United Brotherhood

of Carpenters and Joiners of America ("Union") is a labor organization that

operates in Atlanta, Georgia.  (Pl.'s Response to Def.'s Statement of Undisputed

Facts ("DSUMF") ¶ 1).  The Circle Group, L.L.C. ("Circle Group"), is a Georgia

company engaged in interior construction, including drywall and acoustic ceilings.

(Id. ¶ 2).

---

[1] Because a claim for damages resulting from a secondary boycott is most analogous to "injuries to the person," claims brought for a violation of 29 U.S.C. § 158(b) in Georgia are subject to a statute of limitations of two years.  See O.C.G.A. § 9-3-33; Prater v. United Mine Workers of America, Districts 20 & 23, 793 F.2d 1201, 1209-10 (11th Cir. 1986).  The Court notes that Circle Group filed its original Complaint on October 30, 2009, and the earliest conduct cited by Circle Group in its pleadings occurred in 2006.  Thus, recovery for any injuries that accrued prior to October 30, 2007, is barred by the statute of limitations.  However, conduct by the Union prior to that time is relevant for determining the intent and object of the area standards campaign and union activities.  See Fed. R. Evid. 401; Sprint/United Management Co. v. Mendelsohn, 552 U.S. 379, 384 (2008) (citing United States v. Abel, 469 U.S. 45, 54 (1984)).

[2] The following facts, unless otherwise noted, are deemed to be undisputed for the purpose of the parties' motions for summary judgment.  Unless otherwise indicated, these facts are drawn from the statements of material facts as to which there is no genuine issue to be tried filed by the parties in support of their motions for summary judgment.  See L.R. 56.1 B.(2), NDGa.

In late 2003, the Union began an "area standards" campaign in Atlanta (the "Campaign") to encourage the use of certain contractors and to increase the amount of union work relative to the Atlanta construction market.  (Def.'s Response to Pl.'s Statement of Undisputed Material Facts ("PSUMF") ¶¶ 3-5; DSUMF ¶ 3).  "The Campaign is focused on commercial interior construction, specifically, privately owned high rise buildings."  (PSUMF ¶ 3).  The Union's Director of Special Projects, James T. Gibbs, Jr. ("Gibbs"), was responsible for managing the area standards campaign and bannering, handbilling, and picketing activities.  (PSUMF ¶ 2; DSUMF ¶¶ 11, 32).

The term area standards relates to the payment by employers in the construction industry of "'area standards wages'; employer-funded family medical insurance; employer-funded retirement; employer-funded training program; and the proper tax classification of workers as employees, rather than 1099 independent contractors."  (PSUMF ¶ 14).  Circle Group disagrees with the Union's claim that area standards have been established by negotiation between the Union and contractors operating in the area market.  (DSUMF ¶ 4).  Circle Group also disagrees with the Union's assertion that it fails to meet area standards, to the extent that term is defined, or does not offer paid time off, a retirement plan, or health insurance to its employees.  (Id. ¶¶ 4, 10, 14, 16-17, 19-20).

3

The Union bases its belief that Circle Group does not meet area standards on its own investigative efforts through discussions with Circle Group employees and reviews of pay stubs.  (Id. ¶¶ 13-14, 16-24).

A.   The Area Standards Campaign

The Union asserts that the purpose of the area standards campaign is to publicize its "dispute with employers in the carpentry trade who do not pay area standards in an effort to either convince those employers to pay area standards, or convince end users of their services to use their management discretion not to do business with employers who do not pay area standards."  (Id. ¶ 6).  Circle Group alleges that the purpose of the campaign "is to pressure neutral parties to cease doing business with target non-union contractors, in this case Circle . . . ."  (Id. ¶ 6).

Circle Group employees are not members of the Union and the Union was never approached by Circle Group employees about trying to organize Circle Group.  (Id. ¶ 8).

One of the Union's admitted goals for the area standards campaign "is to increase the amount of union work relative to the market" by "exerting influence on 'decision makers' to use contractors who meet area standards."  (PSUMF ¶¶ 4, 7).  The Union maintains a list of "Certified Area Standards Contractors"

("Certified List").  (Id. ¶ 18).  Every contractor on the Certified List is a union

contractor with a contract with Defendant.  (Id.).  When the Union identifies

construction projects using contractors it deems as not meeting its own self-defined

"area standards," it sends a letter entitled "Notice of Labor Dispute" ("Notice

Letter") to the employers, decision makers, and "end users" of labor connected to

the project.  (PSUMF ¶¶ 13, 36; DSUMF ¶ 25).  Personnel who receive these

Notice Letters may include "general contractors, project management teams,

property owners and managers or even tenants, as well as people with a connection

to those entities or employees of those entities."  (PSUMF ¶ 13; DSUMF ¶ 25).

"The Union has told general contractors that as long as they use a target contractor,

[such as Circle Group,] the Union will follow the general contractor and put

pressure on them wherever they work."  (PSUMF ¶ 57).

    B.    <u>Notice Letters</u>

    The Notice Letters, issued during the relevant periods of this action, request

recipients of the letters to use their "managerial discretion to not allow Circle

Group to perform any work on any of your projects unless and until it generally

meets area standards for all of its carpentry craft workers."  (Id. ¶ 14; Ex. 1 to Dep.

of James T. Gibb, Jr. ("Notice Letter")).  The Notice Letters state that complying

with the request will "provide the greatest protection against your firm becoming

publicly involved in this dispute through misunderstanding or error." (Notice Letter). "All parties associated with projects where Circle Group is employed" will be impacted by the Union's "new lawful and aggressive public information campaign against Circle Group." (Id.). "That campaign includes highly visible lawful banner displays, demonstrations, and distribution of handbills at the jobsites and premises of property owners, developers, general contractors, and other firms involved with projects where Circle Group is employed." (Id.). Attached to the Notice Letters were a sample handbill, photograph of a large banner stating "Shame On [name of recipient's firm]" and the words "Labor Dispute," a copy of the instructions for demonstrators, and a copy of the Certified List. (Id.; DSUMF ¶ 26).

The sample handbill contains a picture of a rodent chewing on the American flag and explains the desire for Circle Group to meet area standards. (Notice Letter). The use of a rodent and references to rats in demonstrations is made because, according to the Union, a "rat" can be "someone using directly or indirectly a contractor that doesn't meet area standards." (PSUMF ¶ 52). The sample handbill also contains text, in a smaller font than the main text, which states: "We are not urging any worker to refuse to work nor are we urging any supplier to refuse to deliver goods." (Notice Letter).

The "Instructions for Demonstrators" attached to the Notice Letter state that demonstrators are not to interfere with persons entering or leaving the job; to stop demonstrating when Circle Group is not at the job site; and to contact designated Union personnel if anyone asks questions or asks them to move from a location. (Id.).  One of the purposes of sending Notice Letters with the Instructions to Demonstrators is to "let recipients know that they can expect to see picketing or other demonstrations at their property."  (PSUMF ¶ 25).

The Union would also contact and meet with "decision makers" and third parties about its labor dispute with Circle Group, ask them not to use contractors that did not meet area standards, and, in some circumstances, express the possibility of holding "demonstrations" at their locations regarding its labor dispute with Circle Group.  (Id. ¶¶ 32-35).  "The Union has also told [third-party decision makers] that everything will be cleared up if the target contractor [, Circle Group in this case,] is removed from the job or begins to meet area standards."  (Id. ¶ 58).

The Union subsequently changed the Notice Letters in 2009 and removed the language regarding "adversarial relationship," and changed the language regarding demonstrations in 2010. (Id. ¶¶ 22, 23).[3]

C.      Handbilling, Bannering, and Picketing Activities

Circle Group maintains that the intent of any picketing activity associated with the area standards campaign is to be as disruptive as possible to third parties in the vicinity, while the Union asserts that picketing is designed to draw attention to its area standards campaign. (Id. ¶ 29). Circle Group maintains that chants and demonstrations are directed at third parties and the general public, while the Union asserts that demonstrations and pickets, to include chants, "are done to generate awareness in the general public of the Council's area standards dispute." (Id. ¶¶ 53, 55).

The Union and Circle Group also disagree on whether the activities of the Union in holding up banners and passing out handbills qualifies as bannering and

---

[3] In May 2010, the Union removed the language pertaining to an "adversarial relationship" from the Notice Letter. (Dep. of James T. Gibbs, Jr. at 98:7-100:17). In February 2011, the language regarding "demonstrations" was removed. (Union 5016). The Court finds that this information is admissible for purposes that include demonstrating that the Union could have sent out letters that more clearly explained that its labor dispute was limited to the primary employer. Fed. R. Evid. 407; Ramey, 472 F.2d at 1131.

handbilling or if it is picketing.  (DSUMF ¶¶ 27-28).[4]  The Union asserts that its activities in handing out flyers to the public in a public right of way is handbilling, and Circle Group characterizes it as picketing and disputes that the activities were conducted on public rights of way or property.[5]  (Id. ¶ 28).  Circle Group also disagrees with how the Union has characterized its picketing activities, the content of its signs and banners, and other demonstrations.  (Id. ¶¶ 27-30).  Circle Group admits that the Union's chanting at demonstrations was done in part to draw the public's attention to the area standards campaign, but also claims it was directed toward third-party decision makers.  (Id. ¶ 31).

The picketing signs read "Stop Lowering Area Standards for Atlanta Carpenters" or "Maintain Area Standards for Atlanta Carpenters," with the name of Circle Group on some, but not all, of the signs.  (Id. ¶ 30; Decl. of James T. Gibbs ¶ 13).[6]  In 2009, the signs were changed to more clearly indicate that the dispute was with Circle Group.  (DSUMF ¶ 31; Decl. of James T. Gibbs ¶ 13).

---

[4] The Court notes the objection by Circle Group to the use of the terms handbilling, bannering, and picketing as constituting a legal conclusion, but uses the terms to generally describe the handing out of flyers, use of banners, and carrying of picket signs in demonstration activities by the Union.

[5] DSUMF ¶¶ 30, 38, 39, 43, 44, 45, 46, 55, 66, 81, 86, 94, 100, 101, and 102 all contain challenges to the Union's assertion that activities were conducted on public rights of way.

[6] To the extent that Circle Group argues that the deposition testimony of Gibbs is in conflict with his declaration, the Court finds that it is not because the deposition

D.   Hyatt Hotel Project

In 2006, one of the first demonstrations by the Union involving Circle Group occurred at the Hyatt Hotel in downtown Atlanta.  (DSUMF ¶ 35).  After notifying the general contractor of a project at the hotel, the Union began picketing on November 2, 2006, and continued to picket there off and on until approximately January 27, 2007.  (Id.).  The Union occasionally handbilled at the hotel from November 2, 2006, until March 13, 2007.  (Id. ¶ 36).  The Union also placed a banner in front of the hotel on November 16, 2006, and did so periodically in front of other Hyatt hotels in the Atlanta area between November 28, 2006, and February 28, 2007.  (Id. ¶¶ 38-39).

E.   Marriott Marquis

In 2007, while demonstrating at the Hyatt Hotel, the Union learned that the Circle Group was also doing construction work at the Marriott Marquis hotel in downtown Atlanta.  (Id. ¶ 40).  After notifying the general contractor and the Marriott Marquis, the Union began picketing at the hotel on or about November 13, 2006, and continued to do so periodically until February 26, 2007.  (Id.).  The Union occasionally handbilled at the hotel from November 29, 2006, through

---

asked if Gibbs remembered the proportion of signs saying "one thing versus another," and not, as posited by Circle Group, whether he knew what the signs said.  (Dep. of James T. Gibbs 376:13-377:9; Decl. of James T. Gibbs ¶ 13).

August 14, 2009.  The Union also bannered in front of the hotel on December 6, 2006, January 5, 2007, and November 6, 2007, and did so periodically at other Marriott Hotels at 1365 Peachtree Street, and 1132 Techwood Drive, Atlanta, Georgia, on numerous occasions between January 29, and February 7, 2007.  (Id. ¶¶ 42-44).  The Union also demonstrated in front of the Ritz Carlton, a Marriott subsidiary, on Peachtree Street in downtown Atlanta by handbilling and bannering on various occasions between February 6, and March 19, 2007.  (Id. ¶¶ 45-46).

F.    Atlantic Station

In the spring of 2007, the Union learned that Circle Group was performing drywall work at the Atlantic Station development project in Atlanta for VCC, the project general contractor.  (Id. ¶ 47).  After notifying VCC of its labor dispute with Circle Group, the Union passed out handbills on May 4, 2007, in front of the building at which Circle Group was working.  (Id.).

G.    Georgia State

In the spring of 2007, the Union learned that Circle Group was performing drywall work on a dormitory project at Georgia State for Hardin Construction, the project general contractor.  (Id. ¶ 48).  After notifying Hardin of its labor dispute with Circle Group, the Union passed out handbills at Georgia State on two occasions on May 9, and August 22, 2007.  (Id.).

H.      Mansion on Peachtree

In October 2007, the Union learned that Circle Group was working on the construction of the Mansion on Peachtree hotel in Atlanta, Georgia, for Holder Construction, the project general contractor.  (Id. ¶ 52).  After notifying Holder Construction and the management of the Mansion of its labor dispute with Circle Group, the Union periodically bannered and handbilled in front of the construction site between October 31, 2007, and January 2, 2008.  (Id.).

I.      Georgia Power

In late 2007, the Union learned that Circle was working on the construction of a daycare center at Georgia Power for RJ Griffin, the project general contractor. (Id. ¶ 55).  After notifying RJ Griffin and Georgia Power of its labor dispute with Circle Group, the Union periodically bannered in front of the construction site between January 3, and February 11, 2008.  (Id.).

J.      Terminus 100 Project

In December 2007, after learning that Circle Group was working at a project at the Terminus 100 building in Atlanta to build out offices for Ameriprise Financial, the Union sent a Notice Letter to Ameriprise Financial and Kraus Anderson, the project general contractor.  (PSUMF ¶¶ 80-81; DSUMF ¶ 56; Dep. of Katherine Molyson at 36:11-15).  The Union engaged in picketing in front of the

Terminus 100 building from January 4, to January 10, 2008.  (DSUMF ¶ 56).  The

Union also placed banners in front of Ameriprise's offices at 825 Juniper Street,

Atlanta, Georgia, and had an affiliated Union handbill at Ameriprise offices in

Minnesota.  (Id. ¶¶ 58-59).

On January 4, 2008, the Union sent 34 individuals to the Terminus 100

building where they picketed in front of a bridal store.  (PSUMF ¶ 81).  As a result

of the activity in front of the bridal store, the bridal store asked the building

manager to allow it to use a side entrance because patrons who may approach the

store were intimidated by the protestors.  (Dep. of Chip Andrews at 50:2-19).  The

presence of demonstrators from the Union also made tenants of Terminus 100

uncomfortable.  (Id. at 56:3-6).

During the demonstrations, the Union worked with the Terminus 100

property manager, Cousins Properties, to determine the property lines and move to

public property after initially picketing on private property.  (PSUMF ¶ 82).  The

property manager offered to provide the Union space to picket near where the

Circle Group employees entered and exited the building.  (Id. ¶ 87).  The Union

declined asserting that the picketing was not directed at Circle Group employees,

but allegedly to bring awareness to the area standards campaign.  (Id.).  Ameriprise

and Kraus Anderson ultimately terminated their contract with Circle Group.  (Dep. of Katherine Molyson at 64:10-16).

K.     Berry College

In 2008, Circle Group "was hired by R.J. Griffin to perform interior work on a project to construct two dormitories for Berry College."  (PSUMF ¶ 91; DSUMF ¶ 90).  After learning that Circle Group was performing this work, the Union sent a Notice Letter to Dr. Stephen Briggs, the President of Berry College.  (PSUMF ¶ 91; DSUMF ¶ 90).  Gibbs communicated with Berry College regarding possible demonstrations at commencement ceremonies at the college.  (PSUMF ¶ 95).  Gibbs eventually communicated to Berry College that the Union would not demonstrate at the commencement ceremonies.  (PSUMF ¶ 95).  However, the Union conducted bannering near Berry College and a bowling alley where Berry College offered bowling classes using a banner that stated "Shame on Dr. Stephen Briggs of Berry College" and "Labor Dispute," but did not mention Circle Group.  (PSUMF ¶ 98; DSUMF ¶¶ 90, 91).  The Union also sent leaflets to faculty members at a college where Dr. Briggs previously worked.  (PSUMF ¶ 99).

L.     Hotel Palomar and 75 Fifth Street

On October 22, 2007, Circle Group was hired by Hardin Construction Company, the project general contractor, to perform interior construction work on

14

a project at the Hotel Palomar.  (PSUMF ¶ 101; DSUMF ¶ 77).  On or around July 28, 2008, the Union sent a Notice Letter to Donald K. 'Beau' King, Jr., President of Kim King Associates, LLC ("King") and owner of the Hotel Palomar.  (PSUMF ¶ 103).  The Union also notified Hardin and the Hotel Palomar of its labor dispute with Circle Group.  (DSUMF ¶ 77).  King did not comply with the request in the Notice Letter and continued to use Circle Group on the project.  (Dep. of Beau King at 42:12-14).

During the Hotel Palomar project, the Union conducted demonstrations in front of King's offices at 75 Fifth Street.  (Dep. of Beau King at 34:9-12).  The Union conducted handbilling that involved individuals handing out handbills while chanting and using noisemakers during the fall of 2008 and spring of 2009.  (PSUMF ¶ 106; DSUMF ¶¶ 77, 79; Dep. of Beau King at 34:15-18).  The Union also conducted bannering between January 5, and April 14, 2008, and on May 14, 2009, near 75 Fifth Street with a banner that stated "Shame on Beau King of Kim King Associates" and "Labor Dispute."  (PSUMF ¶ 109; DSUMF ¶¶ 78-79).

The Union activity impacted tenants at 75 Fifth Street and area businesses.  On October 21, 2008, Union handbilling activity resulted in a complaint about a handbiller on private property at King's offices, a call to police, and a police

response that resulted in the Union being ordered onto public property. (SCRC002300).

On October 22, 2008, Union handbilling activity and noise during handbilling disrupted business for a restaurant near King's offices and led to the restaurant owner complaining about the noise and statements by handbillers that his food was no good.  (SCRC002302).  One handbiller was sent home after a woman complained about him being sick.  (Id.).

On October 23, 2008, a candy shop owner complained about the proximity of handbillers at 75 Fifth Street to his property and asked that the Union move handbillers away who might be sick.  (SCRC002306).

On October 27, 2008, the manager for an RBC Bank branch at 75 Fifth Street complained about handbillers in front of his branch and called on the police to remedy the situation.  (SCRC002309).

After Circle Group had completed its work at the Hotel Palomar, the Union invited the public on April 29, 2009, for free hot dogs.  (PSUMF ¶ 111; DSUMF ¶ 80; Dep. of James T. Gibbs at 233:3-15).  The invitation was for the same date and time as the hotel's grand opening celebration.  (Id.).  The Union initially set up its hot dog stand in the parking lot of the hotel, but moved after it was determined the hot dog stand was on private property.  (Dep. of Beau King at 35:4-14).  The

hot dogs were served to the public by a "big fat guy in a sombrero" while playing "Mexican" music from a pick-up truck as the grand opening guests arrived at the hotel.  (PSUMF ¶ 111; DSUMF ¶ 80; Dep. of Beau King at 34:23-25, 35:7-8).

M.     Lenbrook Square Retirement Home

On or about January 7, 2008, the Union sent a Notice Letter to Debbie Taylor, the Chief Operating Officer of Lenbrook Square, regarding the use of Circle Group on its construction project.  (PSUMF ¶ 115).  Lenbrook Square is a senior living facility located on Peachtree Street in Atlanta, that has independent living apartments and skilled nursing floors.  (Id. ¶ 113).  The Union picketed Lenbrook Square on various weekdays using between 40 and 56 picketers from January 31, to February 20, 2008.  (PSUMF ¶ 116; DSUMF ¶ 60).  The picketers chanted and Lenbrook security asked the picketers to be quiet.  (PSUMF ¶¶ 118-119).  One picketer was sent home for not chanting and another was sent home for being intoxicated.  (Id. ¶¶ 118, 124).  A deputy sheriff that was hired by the general contractor asked the Union to move its demonstration because traffic could not see coming in and out.  (SCRC002063).  The Union refused to move.  (Id.).  The Union also periodically erected a banner in front of the facility during 2008 that stated "Shame on Debby Taylor of Lenbrook Square" and "Labor Dispute." (DSUMF ¶ 61).

N.      St. Regis Hotel

In early 2008, the Union learned that the Circle Group was performing drywall and interior construction work on the St. Regis Hotel and Condominiums at 88 West Paces Ferry Road in Atlanta, Georgia, for Bovis, the project general contractor.  (DSUMF ¶ 62).  The Union notified Bovis and SR Hotel Developers, the company developing the St. Regis Hotel, that it had a labor dispute with them based on Circle Group's involvement in the hotel project.  (PSUMF ¶ 135; DSUMF ¶ 62; Dep. of James T. Gibbs at 194:5-24).

In March 2008, the Union picketed Circle Group on two occasions at the St. Regis Hotel project with 56 and 45 picketers, respectively.  (PSUMF ¶ 136).  The Union also picketed the hotel on various weekdays between March 24, and April 30, 2008; on August 1, 2008; and between June 29, and August 7, 2009.  (DSUMF ¶ 62).  "The Union's picketing at the St. Regis included signs, whistles and chanting so loud that is could be heard across multiple lands of traffic on Peachtree Street, in the construction office off of Pharr Road and even on the 20th floor of the construction site."  (PSUMF ¶ 139).  The Union also placed a banner in front of the St. Regis on various days from June 29, through August 7, 2009, that read "Shame on St. Regis" and "Labor Dispute."  (DSUMF ¶ 63).

The Union also engaged in bannering in the residential neighborhoods of Ron Terwilliger ("Terwilliger"), Kent Levenson ("Levenson"), and Phillip Roy ("Roy"), investors in SR Hotel Developers.  (PSUMF ¶ 141; DSUMF ¶ 66; Dep. of James T. Gibbs at 194:9-195:19).  One of the banners stated: "Shame on Ron Terwilliger of SR Hotel Development" and "Labor Dispute."  (DSUMF ¶ 64; Dep. of James T. Gibbs at 194:15-17).  The bannering of Terwilliger's home occurred on several weekdays between April 18, and May 30, 2008.  (DSUMF ¶ 64).

Another banner stated "Shame on Kent Levenson of SR Hotel Development" and "Labor Dispute."  (Id. ¶ 66).  This banner was placed outside of Levenson's office on Peachtree Street in Atlanta, Georgia.  (Id. ¶ 66).

On May 23, 2008, the Union also handbilled outside of the Phillips Arena in Atlanta during an Atlanta Dream women's professional basketball game.  (Id. ¶ 65).  Terwilliger "was a part-owner of the Atlanta Dream at the time."  (Id.).

O.     Georgia World Congress Center and Omni Hotel

After storms damaged the Georgia World Congress Center ("GWCC") in the spring of 2008, the Union learned that Circle Group "was performing drywall work for general contractor Holder Construction."  (Id. ¶ 72).  The Union sent a copy of a handbill to managers in charge of construction and storm damage repairs regarding the use of Circle Group on the project. (PSUMF ¶ 128; Dep. of Michael

R. Fancher at 36:13-37:25).  The handbill stated "SHAME ON Georgia World

Congress Center For Desecration of the American Way of Life" at the top and that:

"The Carpenters Union has a labor dispute with **Circle Group**."  (Ex. 1 to Dep. of

Michael R. Fancher).  Like the sample handbill included with Notice Letters, the

handbill sent to the GWCC stated: "We are not urging any worker to refuse to

work nor are we urging any supplier to refuse to deliver goods."  (Id.).

On April 21, 2008, the Union, through Gibbs, also filed an application to

demonstrate and handbill on GWCC property.  (PSUMF ¶ 130; Ex. 37 to Dep. of

James T. Gibbs).  In the application, Gibbs crossed out rules prohibiting "any noise

making devices or sound amplifying apparatus or shouting, singing or other

offensively boisterous conduct interfering with the intended purpose of the

facilities of the [GWCC] or reasonable enjoyment by attendees at an event."

(PSUMF ¶ 130).  After deleting those terms from the application, the Union

subsequently engaged in noise making activities at the GWCC during its picketing

and handbilling.  (Dep. of James T. Gibbs at 262:9-11; SCRC002160).

On May 1, and July 2, 2008, the Union conducted picketing in front of the

GWCC.  (SCRC002160; SCRC002221.036).  On June 23, 25, and 26, 2008, the

Union conducted handbilling in front of the GWCC.  (DSUMF ¶ 73; Dep. of James

T. Gibbs at 254:22-256:15, Exs. 34-35).  At the time of the picketing and

handbilling of the GWCC, Circle Group was working nearby at the Omni Hotel for general contractor Skanska.  (DSUMF ¶ 74; Dep. of James T. Gibbs at 256:13-18; SCRC002221.022).  The demonstration activity at the GWCC included the use of an empty five-gallon bucket as a drum and a bullhorn in order to amplify the noise. (SCRC00221.023; Dep. of James T. Gibbs at 255:13-256:12).  On May 1, 2008, the noise from the picketing at the GWCC caused the Union to note that an Omni Hotel guest became "irate" and went "nuts."  (SCRC002160).

On June 23, 25, and 26, 2008, the same days as it was handbilling at the GWCC, but at different times of day, the Union picketed at the Omni Hotel where the Circle Group was working.  (DSUMF ¶ 74; Dep. of James T. Gibbs at 256:13-15, Exs. 34-35; SCRC002221.023).  The Union also picketed at the Omni Hotel on June 27, and July 2, 2008.  (DSUMF ¶ 74; Ex. 36 to Dep. of James T. Gibbs; SCRC002221.037).  The number of picketers at the Omni Hotel ranged from 54 to 72 picketers.  (Exs. 34-36 to Dep. of James T. Gibbs; SCRC002221.023). Picketing occurred at two separate buildings that comprised the Omni Hotel because the Union asserts that Circle Group employees were present at both locations, even though they were only working on one building.  (PSUMF ¶ 131). The Union also periodically handbilled at the Omni Hotel from September 18, through October 10, 2008.  (DSUMF ¶ 76).

P.      Aberdeen Condominium and W Hotel and Condominium Projects

In the spring of 2008, the Union learned that Circle Group may have been awarded a drywall subcontract for work on the Aberdeen Condominium project by Hardin, the project general contractor.  (Id. ¶ 67).  The Union also learned that Circle Group was working for Hardin on a project at the W Hotel and Condominiums in downtown Atlanta.  (Id. ¶ 69).  The Union sent Notice Letters to Hardin and the owner and developers of each project, as well as a company planning to open a restaurant in the W Hotel.  (Id.  ¶¶ 67, 69).  The developer of the Aberdeen Condominium chose to use a union contractor instead of Circle Group and the Union never conducted demonstrations.  (Id. ¶ 68).  In the spring or early summer of 2008, the Union picketed the W Hotel and Condominiums.  (Dep. of Jeffrey Musto at 45:6-46:22).

Q.      Gwinnett Braves Stadium and Walt Disney World

In October 2008, Circle Group was hired by Barton Malow, a general contractor, to perform interior construction work on the minor league Gwinnett Braves stadium being built in Lawrenceville, Georgia, by the Gwinnett Convention and Visitors Bureau ("GCVB").  (PSUMF ¶¶ 142-143).  The Atlanta National League Baseball Club, Inc. ("ANLBC" or "Atlanta Braves") owns the Gwinnett Braves and the Atlanta Braves.  (Id. ¶ 143).

On or around October 14, 2008, the Union sent Notice Letters to Barton Malow, the GCVB, and the Atlanta Braves.  (PSUMF ¶ 144; DSUMF ¶ 81).  On November 12, 2008, Barton Malow sent a reply letter to the Union in response to the Union's demand "that Barton Malow either replace Circle Group or structure some arrangement whereby Circle Group's employees are paid wages agreed to by" the Union.  (Union 299).  Barton Malow told the Union that it would not agree to its demands and that its threats to "increase its coercive efforts" would be met by an unfair labor practice charge.  (Id.).

Circle Group claims that the Union threatened Phil Roy, Barton Malow's Vice President, that it would come after Barton Malow if it awarded any of the interior work for the Gwinnett Braves stadium to Circle and told Doug Maibach, Barton Malow's Executive Vice President and Chairman, that it wanted Circle Group to "go away."  (PSUMF ¶¶ 146, 155).

The Union also sent a "Shame on Phil Roy" fax to his daughter's high school; put a "Shame on Phil Roy of Barton Malow" banner up in his residential neighborhood and outside Barton Malow offices; sent "Shame on Barton Malow" and "Shame on Circle Group" handbills with Doug Maibach's contact information to Maibach's neighbors and a charitable organization of which Maibach was the president; put a banner up near the school attended by Atlanta Braves Executive

Vice President Mike Plant's ten and twelve-year-old children that said "Shame on Mike Plant;" and sent handbills to Mike Plant's neighbors stating "Shame on Mike Plant for Desecration of the American Way of Life."   (Id. ¶¶ 146, 148-153; DSUMF ¶¶ 83-84, 87).   The Union also placed a banner outside of the Atlanta Braves' stadium at Turner Field on various dates in 2008 and 2009 that stated: "Shame on Mike Plant of the Atlanta Braves" and "Labor Dispute."  (DSUMF ¶ 81).

Preston Williams ("Williams"), Managing Director of the GCVB, was involved in the construction of the Gwinnett Braves stadium.  (Id. ¶ 85).  The Union placed a banner that read "Shame on Preston Williams of GCVB" and "Labor Dispute" outside of the GCVB offices on various weekdays between November 21, 2008, and January 30, 2009.  (Id. ¶ 96).

In a Supplemental Declaration filed in opposition to Circle's Motion for Partial Summary Judgment, Gibbs denies telling anyone that the Union would come after Barton Malow if it awarded work to Circle Group, that the Union wanted Circle Group to "go away," or targeting the children of Barton Malow or Braves executives.  (PSUMF ¶¶ 146, 150, 155).[7]

---

[7] Although it could be read as a self-serving affidavit that should not be considered on the motion for summary judgment, the Court finds the supplemental declaration of Gibbs is not inconsistent with any prior testimony regarding conversations

After these actions did not result in Circle Group being removed from the Gwinnett Braves project or paying what the Union considered to be area standards, the Union, through Gibbs, "contacted Disney in Florida where the Atlanta Braves hold spring training about the Union conducting demonstrations at Disney."  (Id. ¶ 157).  Gibbs also arranged to have banners placed in front of Barton Malow offices in Ohio, Maryland, and Arizona by other affiliated unions.  (DSUMF ¶ 89).

R.     Cherokee County Board of Education

On January 20, 2009, the Union bannered in front of the Cherokee County Board of Education office in downtown Canton, Georgia, after it learned that Barton Malow was bidding on a school construction project.  (Id. ¶ 88).

S.     Terminus 200 Project

In 2009, the Union "learned that Circle was performing drywall work for Hardin, who was constructing Terminus 200 in the Terminus development" in Atlanta, Georgia.  (Id. ¶ 92).  After notifying Hardin and the property manager for the Terminus development, the Union "handbilled on various weekdays in front of

Gibbs had with secondary employers.  See Thompson v. Metro. Multi-List, Inc., 934 F.2d 1566, 1578 n.9 (11th Cir. 1991) (affidavits by officer of organization should be considered on summary judgment); Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 714 (11th Cir. 1984) (unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment); Newsome v. Chatham County Detention Center, 256 F. App'x 342, 346 (11th Cir. 2007) (self-serving affidavit can present genuine issue of material fact).

the Terminus [200 development]" from June 4, through June 12, 2009.  (Id. ¶ 92;

SCRC002584).

Union activity sheets indicate that the handbilling activities had a number of

adverse effects upon businesses and the surrounding community.  (SCRC00254;

SCRC002579; SCRC002574).  The handbillers from the Union were positioned at

approaches to the secondary employer's building and led to: (1) the manager of

one of the stores calling security on June 8, 2009, to have a handbiller removed

from the front door to the business; (2) the owner of another store complaining of

and having problems with handbillers in front of the entrance to his store on June

10, 2009; and (3) the property manager of the Terminus 200 building complaining

of and not wanting paid Union demonstrators in front of the building.

(SCRC00254; SCRC002579; SCRC002574).

T.     Fickett Elementary School

In 2009, the Union learned that Circle Group was working on an Atlanta

Public Schools project at Fickett Elementary School for RJ Griffin.  (DSUMF

¶ 93).  After notifying RJ Griffin and the Atlanta Public Schools of its labor

dispute with Circle Group, the Union handbilled in front of the Atlanta Public

Schools on July 6, 2009.  (Id. ¶ 93).  From August 10, through August 12, 2009,

the Union erected a banner reading "Shame on Fickett Elementary" and "Labor

Dispute" approximately three blocks away from Fickett Elementary School in Atlanta.  (Id. ¶ 93).

U.     Seyfarth Shaw

In 2009, the Union learned that Circle Group was awarded drywall work by Skanska for a project on Seyfarth Shaw's new office build out at 1075 Peachtree Street, Atlanta, Georgia.  (Id. ¶ 94).  After notifying Seyfarth Shaw and Skanska of its labor dispute with Circle Group, the Union placed a banner stating "Shame on Seyfarth Shaw" and "Labor Dispute" outside Seyfarth Shaw's offices from July 28, through October 16, 2009.  (Id. ¶ 94).  Gibbs also coordinated with affiliated unions to have the same banners placed outside of Seyfarth Shaw offices in Los Angeles and Washington, DC, at various times over a one month period while the banner was in front of the Atlanta offices.  (Id. ¶ 95).  The Union also picketed and handbilled outside of the Seyfarth Shaw Atlanta office on various days between September 15, 2009, and May 27, 2010.  (Id. ¶¶ 96-97).  During this activity, two demonstrators got into a fight with their signs and a demonstrator was arrested for blowing a whistle.  (SCRC002706; SCRC002729).

V.     Autotrader

In 2010, the Union "learned that Circle Group was awarded the subcontract to perform drywall work on the Autotrader project by general contractor Holder."

(DSUMF ¶ 99).  "Autotrader's parent company is Cox Enterprises, Inc."  (Id. ¶ 99).  After notifying Holder, Autotrader, and Cox Enterprises of its labor dispute with Circle Group, the Union "placed a banner that read 'Shame on Jimmy Hayes of Cox Enterprises' and 'Labor Dispute' outside another Cox property, [Atlanta] television station WSB-TV, on April 1, 2010[,] and on various days from October 16[,] through November 29, 2010."  (Id.).  The Union also placed a banner outside of Autotrader's offices in Atlanta on March 16, 2011.  (Id. ¶ 100).

W.   Quality Technology Services

In 2010, the Union "learned that Circle [Group] was awarded a subcontract for work on the [Quality Technology Services ("QTS")] project for general contractor RJ Griffin."  (Id. ¶ 101).  After notifying QTS and RJ Griffin of its labor dispute with Circle Group, the Union placed a banner that stated "Shame on Quality Technology Service" and "Labor Dispute" outside of the construction site on various days between May 14, and July 9, 2010.  (Id.).

X.   Georgia Tech

In 2010, the Union "learned that Circle [Group] was awarded a subcontract for work on a [dining hall] project at Georgia Tech for general contractor Juneau Construction."  (Id. ¶ 102).  After notifying Georgia Tech, the Georgia Board of Regents, and Juneau Construction of its labor dispute with Circle Group, the Union

handbilled outside of the dining hall construction project on various days from August 24, through August 31, 2010.  (Id.).  The Union also erected a banner that read "Shame on Georgia Tech" and "Labor Dispute" on Northside Drive in Atlanta and outside the Georgia Tech basketball arena on various days between October 16, 2010, and January 19, 2011.  (Id. ¶ 103).

Y.   Impact on Circle Group

The area standards campaign benefitted union contractors in the Atlanta area.  (PSUMF ¶ 77).  Union publications highlighted negative effects on Circle Group as a result of the area standards campaign.  (Id. ¶ 78).  "Representatives of Circle [Group] have identified five jobs that they claim the Company was not awarded or from which they were removed because of union activity: Ameriprise, Gwinnett Technical College Life Sciences Building, BEST Academy, Philadelphia College of Osteopathic Medicine, and the Aberdeen condominiums."  (DSUMF ¶ 114).  "In addition, Circle [Group] employees claim that they were not awarded or were removed from two unnamed projects for general contractor Brasfield & Gorrie because of union activity."  (Id. ¶ 115).

"On the Ameriprise tenant build-out project, general contractor Kraus-Anderson and tenant Ameriprise terminated their contract with Circle [Group] after Circle [Group] had begun work on-site."  (Id. ¶ 116).  "On the Gwinnett Technical

29

College Life Sciences Building, general contractor Barton Malow rescinded a previously-issued letter of intent to enter into a subcontract with Circle to perform drywall work." (Id. ¶ 117).  On the Philadelphia College project, Circle submitted a proposal but a different drywall and painting subcontractor was ultimately selected for the project.  (Id. ¶ 121).  On the Atlantic Station project, Circle Group bid on and was initially selected as the subcontractor for drywall work, but a different subcontractor was selected before the contract was signed.  (Id. ¶ 123).  On the BEST Academy and Gwinnett Technical College projects, another drywall subcontractor was selected by Barton Malow instead of Circle Group.  (Id. ¶¶ 118, 120).

## II.   DISCUSSION

### A.   Procedural Motions

#### 1.   *Circle Group's Objections to Certain Statements of Undisputed Facts and Declaration Statements*

Circle Group objects to several of Union's Statement of Undisputed Facts and the declarations of Gibbs and Davila that were relied upon for those facts. Circle Group also moves to strike certain statements from the Union's Statement of Undisputed Facts and the declarations of Gibbs and Rigoberto Davila, a Union employee who alleged investigated Circle Group's payment of wages and benefits.

The Court considers these motions first to establish the information upon which it may consider the parties' motions for summary and partial summary judgment.

Circle Group's motion to strike certain statements from the Union's Statement of Undisputed Facts and supporting declarations is not the appropriate remedy.  Federal Rule of Civil Procedure 12(f) permits the Court upon motion of a party to strike from any "pleading" an insufficient defense or any redundant, impertinent, or scandalous matter.  Fed. R. Civ. P. 12(f).  The Federal Rules also narrowly define "pleadings" to the exclusion of motions for summary judgment.  Fed. R. Civ. P. 7(a).  It is improper to strike portions of a declaration supporting a motion for summary judgment.  The proper method to challenge such a declaration is to challenge the admissibility of evidence contained in it.  See Jordan v. Cobb Cty., Ga., 227 F. Supp. 2d 1322, 1346-47 (N.D. Ga. 2001); Morgan, 700 F. Supp. at 1576 ("Rather than filing a motion to strike as under Rule 12, the proper method for challenging the admissibility of evidence in an affidavit [in support of a motion for summary judgment] is to file a notice of objection to the challenged testimony.").

In the Northern District of Georgia, challenges and objections to asserted undisputed facts in a response to a motion for summary judgment are required to

be made pursuant to Local Rule 56.1 B.(2), which states:

> This Court will deem each of the movant's facts as admitted unless
> the respondent: (i) directly refutes the movant's fact with concise
> responses supported by specific citations to evidence (including page
> or paragraph number); (ii) states a valid objection to the admissibility
> of the movant's fact; or (iii) points out that the movant's citation does
> not support the movant's fact or that the movant's fact is not material
> or otherwise has failed to comply with the provisions set out in LR
> 56.1 B.(1).

This is the proper manner for filing objections under and compliance with
the Local Rules and Federal Rules of Civil Procedure.  These procedures are
necessary to ensure the "just, speedy, and inexpensive determination of every
action and proceeding."  Fed. R. Civ. P. 1.  Circle Group, in a 105-page response to
the Union's Statement of Undisputed Facts, had the opportunity to, and thoroughly
did, present its objections to the admissibility of certain statements by Davila and
Gibbs and the Court's consideration of the Union's Statement of Undisputed Facts.
Restating those objections through a supplemental pleading and seeking to
improperly strike portions of pleadings is a duplicative and inefficient use of the
parties and this Court's resources.

The Court has noted and considered Circle Group's objections to the Union's Statement of Undisputed Facts.[8] In determining the facts upon which to rely upon where there is no dispute, the Court finds that whether the Union's activities occurred on public rights of way is a disputed issue of fact because there is a conflict between the assertions of Circle Group, supported by deposition testimony of at least one secondary employer, and the Union activity reports and declarations that assert the demonstrations occurred on public property.[9]

The Court also finds that the out-of-court statements relied upon by the Union for its belief that Circle Group was not paying area standards wages are not inadmissible hearsay offered for the truth that Circle Group does not pay area standards — to the extent that term is defined — but are evidence of notice on the part of the Union and to help explain its intent, object, and subsequent actions regarding the area standards campaign.[10] Thus, the Court will consider the Union's

---

[8] As noted *supra*, the Court has not considered the use of the terms handbilling, bannering, and picketing as constituting legal conclusions in ruling on the motion for summary judgment.

[9] Whether Gibbs had personal knowledge of demonstration activity by the Union is irrelevant for the purposes of deciding the motions for summary judgment because the documentary evidence and depositions cited by the parties establish that there is a dispute of fact regarding whether demonstration activity took place exclusively on public property.

[10] Federal Rule of Evidence 801(c) would also allow admission of the statements made by Circle Group employees that were testified to by Davila. These statements would not be hearsay since they would presumably not be offered for

belief that Circle Group was not paying area standards in ruling on the motions for summary judgment.

Because a pleading seeking to strike portions of declarations and facts from the Statement of Undisputed Facts does not comply with our Local Rules and because the Court finds Circle Group's objections to be unconvincing, Circle Group's motion seeking the Court to strike portions of the declarations and statement of undisputed facts is denied, and its objections are overruled.

> 2. *Union's Motion to Strike Circle Group's Reply to the Union's Response to Circle Group's Statement of Undisputed Material Facts*

Motions to strike are governed by Federal Rule of Civil Procedure 12(f), which allows the Court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f); see also Fed. R. Civ. P. 7 (distinguishing between pleadings and motions). The rule applies to pleadings, not to motions or briefs filed in support of motions. See

---

the truth of the matter asserted, but for the purpose of showing notice and the effect on the listener, Davila and the Union, in believing that Circle Group did not pay area standards wages. See Fed. R. Evid. 801(c); United States v. Baker, 432 F.3d 1189, 1208 n.17 (11th Cir. 2005) (statements admissible as non-hearsay when offered to show effect on the listener and subsequent actions); United States v. Hawkins, 905 F.2d 1489, 1495 (11th Cir. 1990) (statements admissible as non-hearsay when offered to show notice on part of the listener) (citing United States v. Gold, 743 F.2d 800, 818 (11th Cir. 1984)). Whether Circle Group actually pays area standards or the Union's claim that it does not was just a pretext for unlawful demonstrations is a disputed issue of fact.

Lentz v. Hospitality Staffing Solutions, LLC, 2008 WL 269607, at *9 (N.D. Ga. Jan. 28, 2008) (noting that Federal Rule of Civil Procedure 12(f) permits the court to strike a pleading, not an affidavit attached to a motion for summary judgment); see also Sidney-Vinstein v. A.H. Robins Co., 697 F.2d 880, 885 (9th Cir. 1983); Sauls v. Bristol-Meyers Co., 462 F. Supp. 887, 888 n.1 (S.D.N.Y. 1978).

Local Rule 56.1 requires the movant for summary judgment to include with the motion and brief, a separate, concise, numbered statement of the material facts to which there is no genuine issue to be tried, and requires the non-movant to respond to the statement of undisputed material facts by objecting to, admitting or specifically refuting each fact. LR 56.1 B.(1), (2), NDGa. The rule also permits the non-movant to file a separate statement of additional facts which the non-movant contends are material and present a genuine issue for trial. Id. at 56.1 B.(2)(b).

If the non-movant files such a statement, the movant must file a response which objects to, admits, or specifically refutes each fact. Id. at 56.1 B.(3). The Local Rules of this Court preclude parties from filing supplemental briefs and materials to a motion for summary judgment "with the exception of a reply brief by the movant, except upon order of the court." Id. at 56.1 A.

Circle Group filed a reply brief in support of its Partial Motion for Summary Judgment and, without seeking leave from the Court to do so, an additional reply to the Union's Response to the Plaintiff's Statement of Undisputed Material Facts. (Pl.'s Reply to Def.'s Response to the Pl.'s Statement of Undisputed Material Facts).  Having reviewed these pleadings, the Court finds that Circle Group's additional reply largely restates the objections and arguments that it made in other pleadings related to the motions for summary judgment, to include its Response to the Union's Statement of Undisputed Facts [111], its Memorandum of Law in Support of Plaintiff's Partial Motion for Summary Judgment [101.1], and its Memorandum of Law in Reply to Defendant's Response to Plaintiff's Partial Motion for Summary Judgment [113].

The Union moves to strike Circle Group's Reply to the Union's Response to the Plaintiff's Statement of Undisputed Material Facts, arguing that Local Rule 56.1 does not allow for a reply in support of a statement of undisputed material facts, that Circle Group did not move for leave to file such a reply, and that, in any event, the reply exceeds the page limitations under the Local Rules.  (Def.'s Mot. to Strike Pl.'s Reply to Def.'s Response to the Pl.'s Statement of Undisputed Material Facts [117] at 2).  Circle Group does not dispute that it did not move for leave from the Court to file the reply or that it fails to conform to the page

limitations of the Local Rules.  Circle Group argues that because the Union asserted additional facts and cited to evidence in responding to its Statement of Undisputed Material Facts — as required by Local Rule 56.1 B.(2)a.(2)(i) — it is entitled to file a reply under Local Rule 56.1 B.(3).  (Pl.'s Opp'n to the Mot. to Strike Pl.'s Reply to Def.'s Response to the Pl.'s Statement of Undisputed Material Facts [121] at 2-3).

Contrary to Circle Group's assertion, Local Rule 56.1 B. only authorizes a reply where a non-movant files a separate statement of additional facts with its response to the movant's statement of undisputed facts.  The Union did not file a separate statement of additional facts in this case.  Because Local Rule 56.1 does not allow for a reply in support of a statement of undisputed material facts without leave of the Court, the Union's Motion to Strike is granted and the Court will not consider Circle Group's Reply in Support of its Statement of Undisputed Material Facts.[11]

---

[11] The Court will not strike Circle Group's submission from the docket.  Rule 12(f) of the Federal Rules of Civil Procedure only authorizes the Court to strike from any pleading "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  It does not authorize the striking of the reply in support of their statement of material fact on the grounds of non-compliance with the Local Rules.

### 3.      Circle Group's Motion to File Substituted Appendix

Federal Rule of Civil Procedure 15(a)(2) provides that a "court should freely give leave [to amend pleadings] when justice so requires."  "District Courts have broad discretion to grant or deny the leave to amend.  In the absence of undue delay, bad faith, dilatory motive or undue prejudice, leave to amend is routinely granted."  Forbus v. Sears Roebuck & Co., 30 F.3d 1402, 1405 (11th Cir. 1994) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).

Circle Group seeks an Order from the Court for leave to file a substituted appendix after it inadvertently omitted certain cited materials and incorrectly cited to one exhibit as a result of a typographical error.  Circle Group filed its request within two months of submitting its original appendix and its request was not opposed by the Union.  LR 7.1 B., NDGa.

Circle Group does not seek to add any materials that were not cited to in its Motion for Partial Summary Judgment, but only to ensure that the cited evidence is properly included in the appendix after it was inadvertently omitted.  Allowing a substituted appendix to be filed will not unduly prejudice the Union since the exhibits had previously been produced in the course of discovery and were cited in Circle Group's motion.  The Court finds that there is no undue delay, bad faith,

dilatory motive, or undue prejudice to the parties and the request to file the substituted appendix is granted.

*4.    Defendant's Motion to Quash Subpoena to Produce Documents*

On July 20, 2010, the parties submitted a Joint Discovery Plan to the Court for approval. On July 21, 2010, the Court approved the parties proposed plan and set December 15, 2010, as the date for the close of all discovery. On November 1, 2010, the parties filed a Joint Motion for Extension of Time to Complete Discovery through and including February 15, 2011. On November 2, 2010, the Court approved the request to extend discovery and notified the parties that no further extensions of the deadline would be granted. (Order of Nov. 2, 2010).

On February 14, 2011, one day prior to the close of discovery, Circle Group served a subpoena upon Berry College seeking:

> 1. All pleadings and other papers filed with in [sic] the Superior Court of Floyd County, State of Georgia, in the matter of Berry College, Inc., v. Southeastern Carpenters Regional Council, Civil Action No. 08CV04518-JFL001 ("Berry College Litigation."[).]
>
> 2. All transcripts of any deposition taken in the Berry College Litigation.
>
> 3. All transcripts of any hearing held in connection with the Berry College Litigation.

(Ex. 5 to Def.'s Mot. to Quash Subpoena to Produce Documents).

Berry College complied with the February 14, 2011, subpoena and provided the documents requested.  (Ex. 6 to Def.'s Mot. to Quash Subpoena to Produce Documents).

On July 19, 2011, Circle Group filed an additional subpoena seeking:

> All documents relating to litigation between Berry College and Southeastern Carpenters filed in Superior Court of Floyd County, Civil Action No: 08cv04518, except those that are subject to the attorney-client privilege.  This demand includes, but is not limited to any and all settlement agreements, releases, covenants not to sue and other agreements of any kind between the parties.  These documents are sought in preparation for trial.

(Pl.'s Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action of July 19, 2011 [125.1]).

On August 2, 2011, the Union moved to quash the subpoena on the grounds that it is an untimely discovery request; the settlement agreement between the Union and Berry College that is sought by Circle Group is confidential and inadmissible; and the settlement agreement is not reasonably calculated to lead to discovery of admissible evidence.  (Def.'s Memo. of Law in Support of Mot. to Quash Subpoena at 4, 7).

Circle Group, in its response to the Union's Motion to Quash, asserts that it is not seeking the settlement agreement for discovery purposes; does not intend to use the document to find additional information; does not intend to seek

40

permission to depose additional witnesses; and that it intends to use the settlement agreement for purposes of trial preparation and at trial.  (Pl.'s Response to Def.'s Mot. to Quash Subpoena at 3).  Circle Group also asserts that requiring "compliance with the subpoena will not burden either the Union or the Court by delaying the filing of dispositive motions, since they have already been filed."  (Id. at 5).

A district court has broad discretion to control the pace of litigation and the course of discovery to ensure that cases move to a timely and orderly conclusion. Chrysler Intern. Corp. v. Chemaly, 280 F.3d 1358, 1360 (11th Cir. 2002); Am. Key Corp. v. Cole Nat'l Corp., 762 F.2d 1569, 1578 (11th Cir. 1985).  It also has broad discretion to impose sanctions on uncooperative litigants who impede the orderly processing of a case or fail "to obey a scheduling or other pretrial order."  See Fed. R. Civ. P. 16(f)(1)(C); Mut. Serv. Ins. Co. v. Frit Indus., Inc., 358 F.3d 1312, 1326-27 (11th Cir. 2004); Phipps v. Blakeney, 8 F.3d 788, 790 (11th Cir.1993); Buchanan v. Bowman, 820 F.2d 359, 361 (11th Cir. 1987).

The majority of jurisdictions, and courts within this Circuit, consider subpoenas issued under Rule 45 to constitute discovery and, thus, are subject to discovery deadlines established by the Court.  See, e.g., Abrams v. Ciba Specialty Chems. Corp., 265 F.R.D. 585, 588 (S.D. Ala. 2010); Mortg. Information Servs.,

Inc. v. Kitchens, 210 F.R.D. 562, 566 (W.D.N.C. 2002) (citing Dreyer v. GACS, Inc., 204 F.R.D. 120, 122 (N.D. Ind. 2001) (noting that "[m]ost courts hold that a subpoena seeking documents from a third-party under Rule 45(a)(1)(C) is a discovery device and therefore subject to a scheduling order's general discovery deadlines"); Integra Lifesciences I, Ltd. v. Merck, 190 F.R.D. 556, 561 (S.D. Cal. 1999) (observing that "[c]ase law establishes that subpoenas under Rule 45 are discovery, and must be utilized within the time period permitted for discovery in a case"); Marvin Lumber and Cedar Co. v. PPG Indus., Inc., 177 F.R.D. 443, 443-44 (D. Minn. 1997) (holding that subpoenas duces tecum meet the definition of discovery contained in Rule 26(a)(5), and that they are therefore "subject to the same time constraints that apply to all of the other methods of formal discovery"); Rice v. United States, 164 F.R.D. 556, 557 (N.D. Okla. 1995) ("Rule 45 subpoenas duces tecum . . . constitute discovery."); 7 Moore's Federal Practice § 34.03[2][a] (stating that, "[a]lthough Rule 45 is not limited by its terms to nonparties, it should not be used to obtain pretrial production of documents or things, or inspection of premises, from a party in circumvention of discovery rules or orders")); Dees v. Hyundai Motor Mfg. Ala., LLC, No. 2:07-CV-306-MHT, 2008 WL 821061, at *1 (M.D. Ala. Mar. 25, 2008); Pushko v. Klebener, No. 3:05-cv-211-J-25HTS, 2007 WL 2671263, at *3 (M.D. Fla. Sept. 7, 2007).

There is an exception to the general rule that Rule 45 subpoenas may not be used to "as a means to engage in discovery after the discovery deadline has passed." See, e.g., Puritan Inv. Corp. v. ASLL Corp., No. Civ. A. 97-1580, 1997 WL 793569, at *1 (E.D. Pa. Dec. 9, 1997). Rule 45 subpoenas may be employed in advance of trial and outside of a discovery deadline for the limited purposes of memory refreshment, trial preparation, or to secure for the use at trial original documents previously disclosed by discovery. See, e.g., Kitchens, 210 F.R.D. at 567; Rice, 164 F.R.D. at 558 n.1; Puritan, 1997 WL 793569, at *1-*2 ("A trial subpoena is not an appropriate means of ascertaining facts or uncovering evidence.").

This general rule and limited exception helps ensure that the course of discovery is controlled and cases can progress to a timely and orderly conclusion. See Chemaly, 280 F. 3d at 1360; BASF Corp. v. Old World Trading Co., No. 86 C 5602, 1992 WL 24076, at *2 (N.D. Ill. Feb. 4, 1992) ("the court's policy of requiring parties to submit a pretrial order detailing those documents which it may use at trial is rendered nugatory if a trial subpoena may issue demanding documents not previously produced or identified"). Practical considerations of case management compel the conclusion that Rule 45 subpoenas issued after the close of discovery and seeking to re-open discovery under the guise of trial

43

preparation should be quashed.  See, e.g., Abrams, 265 F.R.D. at 589; Dreyer, 204 F.R.D. at 123 (allowing a party to continue formal discovery after the deadline "unnecessarily lengthens [the] discovery process, and diverts the parties' attention, from the post-discovery aspect of preparing a case for Trial").

The Court finds that Circle Group's subpoena, issued after the discovery deadline, is not seeking documents for memory refreshment or trial preparation, and does not seek an original copy of a document that was already produced in discovery.  Circle Group could have included the information it seeks in its initial subpoena, which was complied with by Berry College.  It did not.  The subpoena request essentially reopens discovery more than five months after it closed.  (Def.'s Mot. to Quash Subpoena to Produce Documents at 3).  The Court finds that Circle Group's subpoena constitutes an untimely discovery request and it is quashed.

B.    Motions for Summary Judgment

1.    Summary judgment standard

Upon motion by a party, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Parties "asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions,

documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).

The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999). Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999). Non-moving parties "need not present evidence in a form necessary for admission at trial; however, [they] may not merely rest on [their] pleadings." Id. "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

The Court must view all evidence in the light most favorable to the party opposing the motion and must draw all inferences in favor of the non-movant, but only "'*to the extent supportable by the record*.'" Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) (quoting Scott v. Harris, 550 U.S. 372, 381 n.8 (2007) (emphasis in original)). "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury

. . . ." Graham, 193 F.3d at 1282.  "If the record presents factual issues, the court

must not decide them; it must deny the motion and proceed to trial." Herzog, 193

F.3d at 1246.  But, this requirement "extends only to 'genuine' disputes over

material facts," meaning "more than 'some metaphysical doubt as to the material

facts.'" Garczynski, 573 F.3d at 1165 (quoting Scott, 550 U.S. at 380).  "Where

the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus.

Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### 2.      Section 8(b)(4) of the National Labor Relations Act

"Section 8(b)(4) of the [National Labor Relations Act, 29 U.S.C. §§ 151 et

seq. (the "Act")] was designed to prohibit 'pressure tactically directed towards a

neutral [secondary] employer in a labor dispute not his own.'" Teamsters Local

Union No. 5 v. NLRB, 406 F.2d 439, 441 (5th Cir. 1969) (quoting Nat'l

Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 623 (1967)).[12]  "The impact of the

section was directed toward what is known as the secondary boycott whose

'sanctions bear, not upon the employer who alone is a party to the dispute, but

---

[12] At the outset of discussing the controlling legal principles in this case, the Court
notes that it finds the National Labor Relations Board ("NLRB") cases cited by the
parties to be persuasive, but adheres to the controlling decisions of the Eleventh
Circuit and looks to persuasive cases from other federal courts before relying upon
"Board law" developed by an administrative agency.  See Sheet Metal Workers'
Intern. Ass'n, Local 15 v. NLRB, 491 F.3d 429, 434-35 (D.C. Cir. 2007).

upon some third party who has no concern in it.'"  Local 761, Int'l Union of Elec.

v. NLRB, 366 U.S. 667, 672 (1961) (quoting Int'l Bhd. of Elec. Workers, Local

501 v. NLRB, 181 F.2d 34, 37 (2d Cir. 1950).[13]

Section 8(b)(4) "prohibits union inducement of employees to cease work and

. . . makes it unlawful for a union to threaten, coerce, or restrain 'any person,'

including an employer where the conduct includes one or more proscribed

secondary objectives."  Teamsters Local Union No. 5, 406 F.2d at 440 n.3.  "A

---

[13] The Court finds the following plain-language Seventh Circuit jury instructions to be instructive in understanding the relationship between primary disputes, primary employers, primary activity, neutrals, secondary employers, and secondary activity:

> When a labor organization has a dispute with an employer regarding that employer's labor and employment policies, the dispute is called a primary dispute and the employer is called a primary employer. Federal law protects the right of a labor organization to lawfully picket, or take other lawful action, against an employer with whom it has a primary dispute concerning that employer's labor and employment policies.  The action taken by the union is referred to as primary activity.
> . . .
>
> The Federal law prohibits a union from unlawfully threatening or coercing an employer with whom it does not have a dispute in order to force that employer to cease doing business with a primary employer. The employer with whom the union does not have a dispute is referred to as a neutral or secondary employer.  The union's activity against this neutral or secondary employer is called secondary activity.

See BE & K Const. Co. v. Will & Grundy Counties Bldg. Trades Council, 156 F.3d 756, 764 (7th Cir. 1998).

combination of prohibited action and prohibited objective is essential" to make out a violation of the Act for an unfair labor practice.  Id.

Here, Circle Group has alleged violations of Sections 8(b)(4)(i), 8(b)(4)(ii)(A), and 8(b)(4)(ii)(B).  In the cross motions for summary judgment, Circle Group seeks summary judgment as to liability only on the Section 8(b)(4)(ii)(B) claim and the Union seeks summary judgment on all claims.

### 3.    Prohibited action under Section 8(b)(4)(i)

29 U.S.C. § 158(b)(4)(i) ("8(b)(4)(i)") makes it an unfair labor practice "to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services."  Circle Group claims that Section 8(b)(4)(i) was violated because "at least one of the objectives of the Defendant Union's picketing was to induce or encourage employees of third parties to refuse to work, in violation of Section 8(b)(4)(i) of the National Labor Relations Act." (Am. Compl. ¶ 47).

4.      *Prohibited action under Section 8(b)(4)(ii)(A)*

29 U.S.C. § 158(b)(4)(ii)(A) ("8(b)(4)(ii)(A)") makes it an unfair labor

practice to "threaten, coerce, or restrain any person engaged in commerce or in an

industry affecting commerce, where . . . an object thereof is forcing or requiring

any employer or self-employed person to join any labor or employer organization

. . . ."  See Mobile Mech. Contractors Ass'n, Inc. v. Carlough, 664 F.2d 481, 485

(5th Cir. Unit B 1981) (Section 8(b)(4)(ii)(A) prohibits efforts to compel an

employer to join a union or act as if it were a member of an employer

organization).  Circle Group claims that Section 8(b)(4)(ii)(A) was violated

because, since on or about October 2006, the Union threatened, coerced or

restrained various employers, entities, individuals, or executives engaged in

interstate commerce or an industry affecting interstate commerce "with an object

of: (a) forcing or requiring The Circle Group to join Defendant Union . . . ."  29

U.S.C. § 158(b)(4)(ii)(A); (Am. Compl. ¶¶ 9-10).

5.      *Prohibited action under Section 8(b)(4)(ii)(B)*

29 U.S.C. § 158(b)(4)(ii)(B) ("8(b)(4)(ii)(B)") makes it an unfair labor

practice for a labor organizer or its agents to "threaten, coerce, or restrain any

person engaged in commerce or in an industry affecting commerce where . . . an

object thereof is . . . forcing or requiring any person to," among other things,

"cease doing business with any other person."  Circle Group claims that Section

8(b)(4)(ii)(B) was violated because, since on or about October 2006, the Union

threatened, coerced or restrained various employers, entities, individuals, or

executives engaged in interstate commerce or an industry affecting interstate

commerce "with an object of: . . . forcing or requiring the entities to cease doing

business with The Circle Group."  (Am. Compl. ¶¶ 9-10).

Section 8(b)(4)(ii)(B) "aims to prohibit a union that has a labor dispute with

one employer (the primary employer) from exerting pressure on another neutral

employer (the secondary employer), where the union's conduct is calculated to

force the secondary employer to cease doing business with the primary employer."

Kentov v. Sheet Metal Workers' Int'l Ass'n Local 15, 418 F.3d 1259, 1263 (11th

Cir. 2005) (citing Nat'l. Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 620-27

(1967)); see also Hirsch v. Bldg. and Const. Trades Council of Phila. and Vicinity,

530 F.2d 298, 305 (3d Cir. 1976) (Section 8(b)(4)(ii)(B) "prohibits a union from

exerting indirect economic pressure on the employer with whom it has its primary

dispute by attempting to force neutral employers or individuals to sever business

relations with its primary adversary through threats, coercion, or restraints").  "As

the Supreme Court has explained, Section 8(b)(4)(ii)(B) implements 'the dual

congressional objectives of preserving the right of labor organizations to bring

pressure to bear on offending employers in primary labor disputes and of shielding

unoffending employers and others from pressures in controversies not their own.'"

Kentov, 418 F.3d at 1263 (quoting NLRB v. Denver Bldg. & Constr. Trades

Council, 341 U.S. 675, 692 (1951)).

"A violation of Section 8(b)(4)(ii)(B) consists of two elements: (1) a union

engages in conduct that threatens, coerces, or restrains an employer or other person

engaged in commerce; and (2) an object of the union's conduct is to force or

require an employer or person not to handle the products of, or to do business with,

another person." Kentov, 418 F.3d at 1263 (citing 29 U.S.C. § 158(b)(4)(ii)(B)).

C.     Exceptions for certain union conduct under Section 8(b)(4)

Along with an exception for what is known as primary picketing, there is a

'publicity proviso' exception in Section 8(b)(4) that provides:

> nothing contained in [Section 8(b)(4)] shall be construed to prohibit
> publicity, other than picketing, for the purpose of truthfully advising
> the public, including consumers and members of a labor organization,
> that a product or products are produced by an employer with whom
> the labor organization has a primary dispute and are distributed by
> another employer, as long as such publicity does not have an effect of
> inducing any individual employed by any person other than the
> primary employer in the course of his employment to refuse to pick
> up, deliver, or transport any goods, or not to perform any services, at
> the establishment of the employer engaged in such distribution;

29 U.S.C. § 158(b)(4).

### 1.   *Authorized peaceful, non-picketing activity under the proviso*

Under the publicity proviso, a peaceful area standards campaign using handbilling or bannering, truthfully advising the public of a labor dispute, that does not have a proscribed secondary object or conduct element, such as picketing or disruptive or otherwise coercive non-picketing conduct, implicates First Amendment concerns and does not violate Section 8(b)(4). See DeBartolo Corp. v. Fla. Gulf Coast Bldg. and Const. Trades Council (DeBartolo), 485 U.S. 568, 583-84 (1988); Kentov, 418 F.3d at 1265; Benson v. United Bhd. of Carpenters, Locals 184 & 1498, 337 F. Supp. 2d 1275, 1278-79 (D. Utah 2004) (combination of peaceful handbilling and bannering not proscribed by Section 8(b)(4) where no allegation union representatives shouted, patrolled, blocked entrances, acted aggressively, or initiated verbal conversations with the public); Carpenters Local No. 1506 (Eliason), 355 NLRB No. 159, at *2 (2010) (no violation where "banners were held stationary on a public sidewalk or right-of-way, no one patrolled or carried picket signs, and no one interfered with persons seeking to enter or exit from any workplace or business").

Handbilling, bannering, or other forms of demonstration that do not involve ambulatory picketing or patrolling can become the functional equivalent of picketing and violate Section 8(b)(4)(ii)(B) where there is a mixture of

communication and coercive conduct designed to further the object of exerting pressure on a neutral secondary employer to cease doing business with the primary employer with which a union has a labor dispute.  See Kentov, 418 F.3d at 1265-67.  Certain forms of informational handbilling or bannering activity can be considered picketing in violation of 8(b)(4) because picketing is not limited to the traditional concept of persons patrolling with signs on sticks and "it is well-settled that the existence of placards on sticks is not a prerequisite to a finding that a union engaged in picketing."  Kentov, 418 F.3d at 1265 (citing Mine Workers Dist. 2 (Jeddo Coal Co.), 334 NLRB 677, 686 (2001); Service Employees Local 87 (Trinity Building Co.), 312 NLRB 715, 743 (1993)).

The distinction between picketing and bannering or handbilling is that "picketing is 'a mixture of conduct and communication' and the conduct element 'often provides the most persuasive deterrent to third persons about to enter a business establishment.'" DeBartolo, 485 U.S. at 580 (1988) (quoting NLRB v. Retail Store Employees, 447 U.S. 607, 619 (1980) (Stevens, J. concurring)).  "The important feature of picketing appears to be posting by a labor organization . . . of individuals at the approach to a place of business to accomplish a purpose which advances the cause of the union, such as keeping employees away from work or keeping customers away from the employer's business." Kentov, 418 F.3d at 1265

(citing Lumber & Sawmill Workers Local Union No. 2797 (Stoltze Land & Lumber Co.), 156 NLRB 388, 394 (1965)).  But see Eliason, 355 NLRB No. 159, at *8 (narrowly defining picketing as requiring the element of confrontation to find "picketing proscribed as coercion or restraint within the meaning of 8(b)(4)(ii)(B)").

The publicity proviso is not without limitation and the use of bannering and handbilling as a means of "truthfully advising the public" of a labor dispute also requires the banners and handbills convey truthful information.  29 U.S.C. § 158(b)(4).  Banners that state there is a labor dispute and name the secondary neutral employer are not technically untruthful within the meaning of the Act because "Congress in the NLRA seemingly indicated that a 'labor dispute' did not depend on 'whether or not the disputants stand in the proximate relation of employer and employee.'"  See Benson, 337 F. Supp. 2d at 1278-79 (banners stating "shame on [secondary neutral employer]" and "labor dispute" are not untruthful under the NLRA).  But see Serv. Employees Int'l Union Local 525, 329 NLRB 638, 639 n.12, 681-82 (1999) (disruptive demonstrations outside private homes of neutrals with signs or handbills naming a secondary neutral can violate Section 8(b)(4)(ii)(B)).  Because banners are by their very design intended to stimulate further inquiry and grab the public's attention, they are also "not 'false'

simply because [they] fail to inform the public as to whom the union has its

'primary,' as opposed to 'secondary' dispute . . . ."  See id. at 1280; Kohn v. Sw.

Reg'l Council of Carpenters, 289 F. Supp. 2d 1155, 1169 (C.D. Cal. 2003).

*2.     Authorized primary and common situs picketing*

Section 8(b)(4)(ii)(B) also makes clear that picketing of a primary employer

with whom a union has a labor dispute is not an unlawful activity under the Act.

29 U.S.C. § 158(b)(4)(ii)(B) ("nothing contained in this clause (B) shall be

construed to make unlawful, where not otherwise lawful, any primary strike or

primary picketing").  Section 8(b)(4) does not prohibit what is known as common

situs picketing where a primary employer, like Circle Group, is working at a

property belonging to a neutral or secondary employer, as long as the picketing is

primary in nature.  See, e.g., NLRB v. Ironworkers Local 433, 850 F.2d 551, 554

(9th Cir. 1988).

"Informational picketing at a common work site advising the public that an

employer pays substandard wages is lawful.  However, even informational

picketing . . . will be considered unlawful if any object of the picketing is for an

unlawful purpose."  Lane Crane Serv., Inc. v. Int'l Bhd. of Elec. Workers, Local

Union No. 177, 704 F.2d 550, 553 (11th Cir. 1983) (quoting Texas Distribs., Inc.

v. Local Union No. 100, United Ass'n of Journeymen, 598 F.2d 393, 398 (5th Cir.

55

1979), abrogated on other grounds by, Summit Valley Indus., Inc. v. Local 112,

United Bhd. of Carpenters, 456 U.S. 717 (1982)).  Common situs picketing must

also be conducted "in a way least calculated to induce secondary effects."  Ramey

Construction Co. v. Local 544, Painters, Decorators and Paperhangers, 472 F.2d

1127, 1131 (5th Cir. 1973).

　　　　　3.　　Determining primary picketing under Moore Dry Dock and
　　　　　　　　Superior Derrick

　　　　Whether picketing is primary in nature, conducted in a way least calculated

to induce secondary effects, and directed primarily at the employer with whom the

union has its labor dispute, is determined by considering the criteria articulated in

Sailors' Union of the Pacific (Moore Dry Dock), 92 NLRB 547, 549 (1950) and

Superior Derrick Corp. v. NLRB, 273 F.2d 891 (5th Cir. 1960).[14]  For picketing at

a common situs to be classified as the primary activity directed at the primary

employer without a proscribed secondary object under Moore Dry Dock, "the

picketing must meet the following conditions: (a) the picketing is strictly limited to

times when the situs of the dispute is located on the secondary employer's

premises; (b) at the time of the picketing the primary employer is engaged in its

_____

[14] A secondary employer may mitigate the effects of a primary picket at a common
situs and confine a picket to a specific area by establishing a reserve gate for the
primary employer's exclusive use.  See NLRB v. Ironworkers Local 433, 850 F.2d
551, 554 (9th Cir. 1988).  The use of a reserve gate is not a significant issue in
deciding the motions before the Court.

normal business at the situs; (c) the picketing is limited to places reasonably close to the location of the situs; and (d) the picketing discloses clearly that the dispute is with the primary employer."  Linbeck Const. Corp. v. NLRB, 550 F.2d 311, 316 (5th Cir. 1977).

"Demonstrating bare compliance with Moore Dry Dock does not, in and of itself, prove that the common situs picketing was not infected with an improper secondary purpose" and "in order to show compliance with requirement [four] of Moore Dry Dock, a deeper inquiry must be made into the union's purpose" pursuant to Superior Derrick.  Ramey, 472 F.2d at 1134.  In interpreting the requirements of Moore Dry Dock, the Eleventh Circuit, in Superior Derrick,[15] stated that a picketing union must "make sure that people are not led to believe that

---

[15] The Eleventh Circuit explained:

> The lesson of Superior Derrick is that if the picketing union does not take sufficient steps to overcome the normal appeal of its picket line, the objective of common situs picketing will be deemed secondary. The 'normal appeal of the picket line' presumably refers to the natural tendency of both the public and other workers to assume that a picket line is striking against the employer on the picketed site.  Since a common situs contains more than the primary employer, the duty evolves for the picketing union to make sure that people are not led to believe that the picket line is directed against anyone other than the primary employer.

Ramey, 472 F.2d at 1134-35.

the picket line is directed against anyone other than the primary employer."
Ramey, 472 F.2d at 1135.

"The failure of a union to observe these criteria which are primarily embodied in the Moore Dry Dock standards, is treated as strongly indicative of a secondary, proscribed object" and violation of 8(b)(4).  See Ramey, 472 F.2d at 1131.  "The Moore Dry Dock standards have been further amplified in this Circuit by a requirement that the picketing union do everything that is reasonably necessary to" avoid causing secondary employers to cease doing business with the primary employer.  See id.  "[T]his requirement places a heavy burden on the picketing union to convince the trier of fact that the picketing was conducted in a manner least likely to encourage secondary effects."  Id.  This Circuit has also held that "[i]f neutral persons were misled or encouraged to act as a result of the picketing, the picketing is unlawful."  Texas Distribs., 598 F.2d at 399.

 D. Prohibited threatening or coercive conduct under Section 8(b)(4)

"[T]he phrase 'threaten, coerce, or restrain' does not describe any sort of measurable physical conduct suggested by the ordinary meaning of those words, but is rather a term of legislative art designed to capture certain types of boycotts deemed harmful by Congress."  Soft Drink Workers Union Local 812, Int'l Bhd. of Teamsters v. NLRB, 657 F.2d 1252, 1267 n.27 (D.C. Cir. 1980).

*1.     Threats*

Because Section 8(b)(4) does not prohibit primary or common situs picketing, a union may inform a secondary employer of its labor dispute with a primary employer and the possibility of, or its intention to, conduct common situs picketing while the primary employer is working at the secondary employer's location.  See Ironworkers Local 433, 850 F.2d at 555.  But, a union may not make an unqualified threat to picket a neutral or secondary in order to force that employer to cease doing business with the primary employer.  See BE & K Const., 156 F.3d at 766.

> Additionally,
>
> a union cannot avoid liability for illegally threatening a secondary employer by conveying the threat with innocuous words, implications and body language.  Liability results from the unlawful threat, not from the particular words or gestures used to convey it.  Nor can a union avoid liability because the same statement could be reasonably interpreted as both a threat of a legal primary picket and a threat of an illegal secondary picket.

See id. at 764 (citation omitted).  Deciphering the language conveyed by a union to determine what it means in context and if it is a prohibited threat of action against the secondary "is a classic jury question."  See id.

2.      *Coercion*

"Coercion under Section 8(b)(4)(ii)(B) involves 'nonjudicial acts of a compelling or restraining nature, applied by way of concerted self-help consisting of a strike, picketing, or other economic retaliation and pressure in the background of a labor dispute.'" <u>Kentov</u>, 418 F.3d at 1264 n.6 (citing <u>Carpenters Ky. State Dist. Council (Wehr Constr., Inc.)</u>, 308 NLRB 1129, 1130 n. 2 (1992) and quoting <u>Sheet Metal Workers Local 48 v. Hardy Corp.</u>, 332 F.2d 682, 686 (5th Cir. 1964)); <u>see</u> <u>also</u> <u>Gold v. Mid-Atl. Reg'l Council of Carpenters</u>, 407 F. Supp. 2d 719, 725 (D. Md. 2005) (quoting <u>Wehr Constr., Inc.</u>, 308 NLRB at 1130 n.2) ("The NLRB has defined this 'coercion' element as 'nonjudicial acts of a compelling or restraining nature, applied by way of concerted self-help consisting of a strike, picketing, or other economic retaliation and pressure in the background of a labor dispute.'"). "In a variety of other instances, the [NLRB] and the courts have recognized that disruptive, non-picketing activity directed against secondaries can constitute coercion." <u>Eliason</u>, 355 NLRB No. 159, at *12.

Coercive conduct can be found where a union handbills or banners at the approach to a neutral secondary employer, such as a hospital or hotel, and stages processions; patrols; shouts; acts aggressively; makes threats; physically or verbally interferes with or confronts persons coming and going from the

establishment; creates a symbolic barrier to those who would enter the establishment; or uses speakers to broadcast messages at an excessive volume toward a building that hired a primary employer as a subcontractor.  See Sheet Metal Workers' Int'l Ass'n, Local 15, 491 F.3d at 438; Kentov, 418 F.3d at 1265-67; Metro. Reg'l Council of Phila. & Vicinity v. NLRB, 50 F. App'x 88, 91-92 (3d Cir. 2002); Benson, 337 F. Supp. 2d at 1278-79; Kohn, 289 F. Supp. 2d at 1168. Coercion can also be found where picketing or disruptive, non-picketing activity is conducted in front of the residential home of a neutral party since that activity could reasonably be foreseen to harass and embarrass the neutral in front of his neighbors, is inherently intimidating and confrontational, is not a primary site or common situs for picketing, and falls outside the "peaceful handbilling [and bannering activity] not involving nonspeech elements" found to be protected by the First Amendment in DeBartolo.  See DeBartolo, 485 U.S. at 574; Serv. Employees Int'l Union Local 525, 329 NLRB at 639 n.12, 681-82.

Thus, picketing and certain types of bannering and handbilling activity can be found to be threatening or coercive and violate Section 8(b)(4) when combined with a prohibited object, such as forcing the secondary employer to cease doing business with the primary employer.  Kentov, 418 F.3d at 1263.

E.      Prohibited object and intent of activity under Section 8(b)(4)

The decisive question in a secondary boycott case is whether the intent or object of the union's activity is directed at the primary employer alone or at secondary employers, with the intention of pressuring the latter to curtail business with the primary employer. The prohibited secondary object need not be the sole object of the union's activity.  Indeed, in the ordinary course of things, a union's ultimate goal will be to influence the primary employer.

Texas Distribs., 598 F.2d at 399-400 (citing Local 761, Electrical Workers v. NLRB, 366 U.S. 667 (1961)); see also Denver Bldg. & Const. Trades Council, 341 U.S. at 689 ("It is not necessary to find that the sole object of the strike was that of forcing the contractor to terminate the subcontractor's contract."); Local 7, Sheet Metal Workers Int'l Ass'n and Andy J. Egan Co., Inc. (Egan), 345 NLRB 1322, 1323 (2005) (quoting Denver Bldg. & Const. Trades Council, 341 U.S. at 689 n.18 (1951)) ("In order for the picketing to be unlawful, the secondary object need only be 'an object'—not the sole object — of the picketing.").  "Any other objectives that [a] Union may have . . ., do not control the secondary boycott analysis." Kentov, 418 F.3d at 1263 n.5 (citing Denver Bldg. & Constr. Trades Council, 341 U.S. at 689; Pye v. Teamsters Local Union No. 122, 61 F.3d 1013, 1023 (1st Cir. 1995)).

        The question of the object of demonstrations is one of fact, the fact finder is not bound to accept self-serving explanations given by a union, and it is

permissible to consider the totality of the union conduct in making that determination.  See NLRB v. Int'l Bhd. of Elec. Workers, Local 265, 604 F.2d 1091, 1097-98 (8th Cir. 1979).

"'In the absence of admissions by the union of an illegal intent, the nature of acts performed shows the intent.'"  Local 761, Int'l Union of Elec. v. NLRB, 366 U.S. 667, 672 (1961) (quoting Seafarers Int'l Union of North America, Atlantic and Gulf Dist., Harbor and Inland Waterways Division v. NLRB, 265 F.2d 585, 591 (D.C. Cir. 1959)); see also Pickens-Bond Const. Co. v. United Bhd. of Carpenters, Local 690, 586 F.2d 1234, 1241 (8th Cir. 1978) ("Intent is inferred from the nature of acts performed.").  "[I]n determining whether a party has violated 8(b)(4), one looks to the object, not the effect, of that party's allegedly impermissible activity" and looks at the totality of the facts and circumstances to determine if there is "an impermissible object under 8(b)(4)."  See Linbeck Const. Corp., 550 F.2d at 319-20 (citing Ramey, 472 F.2d 1127; Constr. and Gen. Laborers Local 438 v. Hardy Eng'g and Constr. Co., 354 F.2d 24 (5th Cir. 1965)); see also Lane Crane Serv., Inc., 704 F.2d at 553 (citing Texas Distribs., 598 F.2d at 399).

The contents of handbills, banners, and letters used in conjunction with union activity may be considered as part of the totality of facts and circumstances

in determining if an impermissible object or intent exists.  See NLRB v. Gen. Truck Drivers, Local No. 315, 20 F.3d 1017, 1020, 1025-27 (9th Cir. 1994), cert. denied, 513 U.S. 946 (1994).

Where a union acts in a manner which it knows will have a secondary effect even though it could act otherwise without creating such effect, doing such an act constitutes a secondary boycott in violation of Section 8(b)(4).  See Texas Distribs., 598 F.2d at 400.  Additionally, "[i]f the union acts with 'mixed motives,' partially primary and partially secondary, its conduct is unlawful under section 8(b)(4); it is not necessary to find that the sole object of the strike was secondary so long as one of the union's objectives was to influence the secondary employer to bring pressure to bear on the primary."  Mautz & Oren, Inc. v. Teamsters, Local No. 279, 882 F.2d 1117, 1120-21 (7th Cir. 1989).

*1.   Prohibited recognitional object in violation of 8(b)(4)(ii)(A)*

A prohibited recognitional object in violation of Section 8(b)(4)(ii)(A) can be found in an area standards campaign where a union seeks to compel an employer to recognize a union, force its collective bargaining agreement upon persons it does not represent, compel a nonunion employer to provide non-cost benefits that union members enjoy, or compel a nonunion employer to do more than equal the total cost of union area wages for its employees.  See NLRB v. Int'l

Bhd. of Elec. Workers, Local 265, 604 F.2d 1091, 1097 (8th Cir. 1979); Gen. Serv. Emp. Union Local No. 73 v. NLRB, 578 F.2d 361, 374 (D.C. Cir. 1978); San Francisco Local Joint Exec. Bd. of Culinary Workers v. NLRB, 501 F.2d 794, 800 (D.C. Cir. 1974).

"[A] recognitional object is established when a union, although purportedly picketing to maintain area standards, undertakes to go beyond a legitimate area standard object and demands that a picketed employer do more than equal the total cost package of its area contracts." Int'l Bhd. of Elec. Workers, Local 265, 604 F.2d at 1097. "[R]ecognitional picketing, even when intended merely to so inform the general public, is not protected when it has the effect of inducing the employees of other employers to stop deliveries or other services to the targeted employer in order to coerce him into recognizing the union." San Francisco Local Joint Exec. Bd., 501 F.2d at 800. "[E]ven if the Union's object was not to gain formal recognition, a union's purpose is deemed 'recognitional' where it attempts to force its collective bargaining agreement upon persons it does not represent." Gen. Serv. Emp. Union Local No. 73, 578 F.2d at 374.

> Similarly, because the rationale for permitting area standards picketing is the recognition of the legitimate concern of unions that the employers with whom they have contractual relationships should not be put at a competitive disadvantage because of the cost of such contracts, a union has no legitimate concern in demanding that a picketed employer observe non-cost benefits which the union obtained

for its own members.  Attempts to impose such noneconomic terms of employment on the employees of other employers sounds more in terms of demanding acceptance of the area bargain than adherence to area standards.

See Int'l Bhd. of Elec. Workers, Local 265, 604 F.2d at 1097.

> 2.  *Prohibited recognitional object under 8(b)(4)(ii)(A) where purpose of an area standards campaign is found to be pretextual*

Additionally, "where a union's avowed area standards objective can be shown to be false or otherwise unsupportable, then an organizational or recognitional object can be inferred."  United Bhd. of Carpenters, Local No. 1245, 229 NLRB 236, 241 (1977) (citing Sales Delivery Drivers, Local 296 (Alpha Beta Acme Markets, Inc.), 205 NLRB 462, 469 (1973); Auto. Emp. Laundry Drivers Local 88 (West Coast Cycle Supply Co.), 208 NLRB 679, 680 (1974)).  Before beginning an area standards campaign, "the burden is on the union to first make reasonable inquiry to determine whether or not the picketed employer is meeting area standards, wages, and benefits.  Otherwise, the purported purpose of area standards picketing may be deemed pretextual, and evidence of improper motive found."  Egan, 345 NLRB at 1331.

An area standards objective is not false or otherwise unsupportable for the purposes of inferring an unlawful recognitional object or violation of Section 8(b)(4) where the area standards campaign regarding a primary employer is based

66

on a reasonable inquiry with as great a degree of thoroughness as the circumstances will permit into the payment of wages and benefits by the secondary, nonunion employer.  See, e.g., Egan, 345 NLRB at 1331; United Bhd. of Carpenters, Local No. 1245, 229 NLRB at 240; United Bhd. of Carpenters and Joiners of America, Local No. 745 (Western Engineering Ltd.), NLRB Gen. Counsel Advice Memo., Case No. 37-CP-55, A.D. 03145, 1989 WL 241592 (July 27, 1989).  This degree of thoroughness does not require direct communication with the nonunion employer and may be based on past familiarity with wages and benefits paid by an employer, discussions with employees of the nonunion employer, information obtained from third party sources, and reviews of pay stubs of employees.  See Egan, 345 NLRB at 1332; Int'l Bhd. of Elec. Workers, Local 453 (Southern Sun Electric Corporation), 242 NLRB 1130, 1131 (1979); Ironworkers Local 378, NLRB Gen. Counsel Advice Memo., Case No. 37-CP-391, A.D. 03208, 1989 WL 241606 (Dec. 29, 1989); Bldg. & Constr. Trades Council of Phila. & Vicinity (Wohlsen Construction Company), NLRB Gen. Counsel Advice Memo., Case No. 4-CC-1466, 4-CP-358, 1982 WL 30173 (Sept. 20, 1982).[16]

---

[16] The union need not ensure that the information upon which it bases its belief of an employer's failure to adhere to area standards is absolutely correct, but only that it is reasonably correct and provides a reasonable basis for its assumption that wages and benefits paid by an employer are below area standards.  See, e.g., United Bhd. of Carpenters, Local No. 1245, 229 NLRB at 240; United Bhd. of

### 3. Prohibited cease doing business object in violation of 8(b)(4)(ii)(B)

An unlawful 'cease doing business' object is demonstrated by conduct that is intended to or is likely to disrupt or alter the business dealings between the primary employer and a neutral.  A union violates Section 8(b)(4)(B) if 'any object of [its coercive activity] is to exert improper influence on secondary or neutral parties.'

Eliason, 355 NLRB No. 159, at *20 (Schaumber, Hayes, dissenting) (quoting Electrical Workers IBEW Local 501 v. NLRB, 756 F.2d 888, 892 (D.C. Cir. 1985), and citing NLRB v. Operating Eng'rs Local 825, 400 U.S. 297, 304-305 (1971); Denver Bldg. & Constr. Trades Council, 341 U.S. at 689; Iron Workers Local 272 (Miller & Solomon), 195 NLRB 1063 (1972)).  Additionally, "a single threat of such economic retaliation against a neutral is sufficient to violate [Section] 8(b)(4)(ii)(B)."  Hirsch, 530 F.2d at 306; see also Teamsters Local Union No. 5, 170 NLRB 288, 290 (1969) ("If *an* object was to put pressure on Altex to cease doing business with Barber a violation is spelled out."), enf'd, 406 F.2d 439 (5th Cir. 1969), cert. denied, 393 U.S. 1024 (1969).

### 4. Prohibited object and intent in common situs picketing

The question of intent is obviously an elusive one in the common situs context.  The picketing union will rarely declare openly that it has a secondary objective, so the trier of fact must carefully evaluate the

---

Carpenters and Joiners of America, Local No. 745 (Western Engineering Ltd.), NLRB Gen. Counsel Advice Memo., Case No. 37-CP-55, A.D. 03145, 1989 WL 241592 (July 27, 1989).

totality of the union's conduct, in light of the established standards, in making a determination of legality.

. . .

[T]he law has defined the quest for illegal 'object' in terms of the need to actively prevent secondary effects.  The judicial task, then, in determining whether the proscribed object existed, must be framed chiefly in terms of whether the union's behavior evinces an attitude too solicitous of helpful, secondary pressures.

Ramey, 472 F.2d at 1131, 1132.   "[E]ven if the more 'objective' requirements of

Moore Dry Dock and Superior Derrick are satisfied, if the totality of circumstances

unequivocally demonstrates a secondary purpose existed, the picketing should be

deemed unlawful."  Id. at 1135.[17]

F.     Summary judgment on Circle Group's Section 8(b)(4)(i) claim

Circle Group made a threadbare allegation of a violation of Section

8(b)(4)(i) in its Amended Complaint.  (First Am. Compl. at 23).  Circle Group

expressly did not move for summary judgment on its 8(b)(4)(i) claim and points

out that the Union did not mention the 8(b)(4)(i) claim in its Motion for Summary

Judgment.  (Pl.'s Partial Mot. for Partial Summary J. at 1 n.1; Pl.'s Memo. of Law

in Opposition to Def.'s Motion for Summary J. at 1 n.1).  The Court finds the

---

[17] The Court notes and rejects the contention by the Union that Ramey does not require an evaluation of the totality of the circumstances that includes consideration of activity other than picketing when evaluating the existence of an unlawful secondary objective in the common situs picketing context.  (Def.'s Response to Pl.'s Mot. for Partial Summary J. at 27-28).

Union's failure to make any argument in its initial pleading to be insufficient to constitute a motion for summary judgment on this claim. While Circle Group's 8(b)(4)(i) claim is not compelling, it survives at this stage of the litigation.

      G.     <u>Summary judgment on Circle Group's Section 8(b)(4)(ii)(A) claim</u>

The Union seeks summary judgment on Circle Group's claim that 8(b)(4)(ii)(A) was violated by its conduct. The parties agree that the Union did not approach Circle Group employees about trying to organize Circle Group. Circle Group, however, argues that the Union had a recognitional object to its activities and that this intent, coupled with the Union's conduct violates 8(b)(4)(ii)(A) because its alleged investigation of wages paid by Circle Group as compared to the wage rate paid by other construction employers was inadequate, was pretextual, and did not practically or legally provide a sufficient basis for the Union's purported area standards campaign.

An investigation of wages and wage rates only requires a "reasonable inquiry to determine whether or not the picketed employer is meeting area standards, wages, and benefits." <u>Egan</u>, 345 NLRB at 1331. The parties, however, dispute whether the investigatory action by the Union was sufficient to establish a reasonable basis to show that Circle Group failed to meet area standards, thus justifying an area standards campaign targeting Circle Group. Indeed, the Union

has failed to articulate in any reasonable way what is the "area standard" with which it seeks to require compliance.

The Court finds that there are disputed issues of fact based on the nature and scope of the Union's investigation of Circle Group's wages and benefits; and its bannering, handbilling, and demonstration activity, especially to entities and individuals at which and at whom it was directed; regarding whether the Union's activity had a recognitional object as part of its area standards campaign. Thus, summary judgment is inappropriate on Circle Group's 8(b)(4)(ii)(A) claim that the Union threatened, coerced or restrained various employers, entities, individuals, or executives engaged in interstate commerce or an industry affecting interstate commerce "with an object of: (a) forcing or requiring The Circle Group to join Defendant Union    . . . ."  29 U.S.C. § 158(b)(4)(ii)(A); (Am. Compl. ¶¶ 9-10).

H.    Circle Group and the Union's motions for summary judgment on Circle Group's Section 8(b)(4)(ii)(B) claim

1.    *Disputed issues of fact exist regarding whether the Union threatened secondary employers and neutrals because any comments must be considered in context*

There are genuine issues of material fact regarding whether the Union threatened secondary employers in an effort to get them to cease doing business with Circle Group.  There are two competing narratives.  Circle Group claims, and cites to testimony of secondary employer business representatives, that Gibbs

71

threatened those secondary employers by stating there would be adverse

consequences if they used Circle Group on their construction projects.  The Union,

citing Gibb's supplemental declaration, claims that no such threats were ever

made.  Because whether a threat was made depends on the context of any

discussions, it is a "classic jury question" and inappropriate for the Court to

determine whether threats were made on a motion for summary judgment.  See BE

& K Const., 156 F.3d at 764.  Issues of fact and the issue of witness credibility —

both present here — are quintessential questions for a jury to answer.

The Court also notes that the Notice Letters do not, on their face, contain

threats to secondary parties.  Indeed, a union is entitled to inform a secondary

employer of the possibility or intention to conduct picketing while the primary

employer is working at a common situs.  See Ironworkers Local 433, 850 F.2d at

555.  However, whether the Notice Letters, when taken in context with other

words, conduct, and gestures, constitute a threat of an illegal secondary picket is a

factual determination that is appropriately reserved for a jury to determine.  See BE

& K Const., 156 F.3d at 764.

The absence of a threat to encourage a secondary employer to cease doing

business with Circle Group is not dispositive on whether conduct is present that

violates Section 8(b)(4)(ii)(B).  Coercive conduct or improper common situs

picketing by the Union, combined with a prohibited secondary object, also is sufficient to establish a claim for relief under the Act.  The Court next examines whether the conduct was coercive or the picketing was unlawful in this action.

        2.     *Whether the Union's handbilling, bannering, and demonstration activities were coercive and the functional equivalent of picketing*

The facts here present at least a viable and likely a compelling case that the Union's handbilling, bannering, and demonstration activities were not protected by the publicity proviso exception to Section 8(b)(4) because they were functionally equivalent to picketing and consisted of a mixture of disruptive and coercive non-picketing conduct and communication.  See DeBartolo, 485 U.S. at 583-84; Kentov, 418 F.3d at 1265.  A jury may well find that the Union's bannering or handbilling activities were equivalent to picketing because it placed its demonstrators at the approaches to the secondary employer's businesses in order to discourage persons from approaching and advance the cause of the Union in bringing pressure upon those secondary employers to cease doing business with Circle Group.  See Kentov, 418 F.3d at 1265.

However, it is not beyond dispute that the Union's actions were the sort of "nonjudicial acts of a compelling or restraining nature, applied by way of concerted self-help consisting of a strike, picketing, or other economic retaliation

73

and pressure in the background of a labor dispute" that courts have found to

constitute coercion.[18]   See, e.g., Kentov, 418 F.3d at 1264.  A rational jury could

find that some or all of the Union's conduct was not coercive and protected activity

even though the Union focused its conduct at the approaches to neutral secondary

employers and businesses; used at least one demonstrator who was intoxicated and

another who was sick; sought to attract members of the public to a free hot dog

giveaway in front of a high-end hotel during its grand opening; used electrical

noise amplifying equipment from a truck at its hot dog giveaway in front of the

secondary employer's establishment; employed disruptive noise in conjunction

with handbilling that affected area businesses on at least one occasion; and made

derogatory comments about the food served at one secondary party establishment.

See Kentov, 418 F.3d at 1265-67; Metro. Reg'l Council of Phila. & Vicinity, 50 F.

App'x at 91-92; Benson, 337 F. Supp. 2d at 1278-79; Kohn, 289 F. Supp. 2d at

1168.[19]

---

[18] Because the Union's activities were extensive and at different locations, a jury
will have to evaluate which, if any, of the various activities violated Section
8(b)(4).  That is particularly appropriate where, as here, it appears the conduct
became more aggressive over time.

[19] In Kentov, the Eleventh Circuit concluded there was reasonable cause to believe
a violation of Section 8(b)(4) occurred because a union demonstration in front of a
hospital "could reasonably be expected to discourage persons from approaching"
that secondary employer's building.  418 F.3d at 1265.  Additionally, in Benson,
no violation of Section 8(b)(4) was found in union activities in an area standards

The evidence is also that the Union conducted bannering and demonstration activities at the homes of secondary employers and at the schools attended by their children, and thus there is an issue of fact as to the Union's intent and the objective it sought to achieve.  Specifically, it raises an issue of fact whether the activity was intended to coerce secondary employers not to do business with Plaintiff.

Here, the Union claims through the affidavits of Gibbs and by citing to other parts of the record to establish that disputes of material issues of fact exist regarding whether the actions of the Union were disruptive to the operation of businesses, could reasonably be expected to discourage persons from approaching those businesses, or affected the patrons and employees of the secondary employers' businesses.[20]  This evidence, while scant and self-serving, is enough to allow a jury to decide whether the Union's conduct was coercive here.

---

campaign involving secondary employers because there was only peaceful handbilling and bannering not proscribed by Section 8(b)(4), "no evidence whatsoever that the banners provided any 'deterrent' to individuals who want to enter the businesses," and no allegations that union representatives shouted, patrolled, blocked entrances, acted aggressively, or initiated verbal conversations with the public.  337 F. Supp. 2d at 1278-79.

[20] The Court notes that whether the conduct was coercive is a close call on summary judgment and the question is necessarily reserved for the jury even though the Union's own activity sheets indicate that some secondary employers and parties felt the need to resort to calling law enforcement and asked the Union demonstrators to move, quiet down, clear out the areas in front of their businesses and entrances, not employ sick demonstrators in front of their establishments, and not make derogatory comments about their products.

Specifically, a rational trier of fact conceivably might not agree with Circle Group's claim that the Union acted in a coercive manner outside of the "peaceful handbilling [and bannering activity] not involving nonspeech elements" protected by the First Amendment by engaging in inherently intimidating, confrontational, and disruptive nonspeech activity by seeking to harass and embarrass neutral secondary employers in front of their neighbors, children, children's teachers, colleagues, and charitable associates by putting up banners in the employers' residential neighborhoods and in front of schools their children attended, by putting flyers in the mailboxes of neighbors, by sending faxes to the schools of their children, and by sending flyers to the colleagues of a college president.  See DeBartolo, 485 U.S. at 574; Serv. Employees Int'l Union Local 525, 329 NLRB 638, 639 n.12, 681-82 (1999).

The bottom line is the facts here are best, and properly, resolved at trial.

> 3. *Whether the Union's common situs picketing violated Moore Dry Dock / Superior Derrick and had an unlawful object based on the totality of the circumstances*

The Court also finds that there are disputed issues of material fact regarding whether: (1) the picketing clearly disclosed that the dispute was with Circle Group; or (2) the Union conducted its picketing activities in a manner least likely to encourage secondary effects.

Gibbs admits that only some of the pickets noted that the labor dispute was with Circle Group and that the signs were changed in 2009 to more clearly indicate that the dispute was with Circle Group.  While this may constitute compelling evidence that the signs were misleading and the Union failed to take adequate steps to clearly identify the dispute was with Circle Group, the issue of whether the pickets failed to clearly disclose the subject of the labor dispute is the type of fact-specific, context-laden question that is best suited for a jury determination.

Similarly, whether the Union conducted its picketing activities in a manner to encourage, rather than discourage, secondary effects, is also a question best suited for a jury determination.  Although the Union conducted its activities largely on weekdays during working hours, chanted loudly, banged on five-gallon bucket drums, blew whistles, used bullhorns, and sought to bring as much attention to itself while in front of a secondary employer's establishment, the Court declines, albeit reluctantly, to find at this stage of the litigation that no rational jury could find in favor of the Union that its actions constituted protected activity under the Act.

While the failure to observe the criteria embodied in <u>Moore Dry Dock</u> and <u>Superior Derrick</u> does not conclusively establish a "secondary, proscribed object," such a failure is treated as strongly indicative of a violation of Section

8(b)(4)(ii)(B).  See Ramey, 472 F.2d at 1131.  Even though the conduct of the Union strongly indicates a violation of Section 8(b)(4)(ii)(B), the Court finds here that there is enough of a dispute of fact regarding the nature and object of the picketing to survive summary judgment and allow a jury to determine whether the totality of the actions of the Union violated the Act when viewed against the Moore Dry Dock and Superior Derrick criteria and all the facts and circumstances. Again, a jury will have to evaluate the variety of the conduct of the Union, which appears to have become more aggressive over time, at a number of different locations, on different occasions aimed at different entities and individuals.

Because the Court finds that there are disputed issues of material fact regarding whether the conduct of the Union was threatening, coercive, or constituted prohibited picketing, summary judgment on the Section 8(b)(4)(ii)(B) claim is inappropriate.

## III.   CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Plaintiff's Objections to Certain Statements of Undisputed Facts and Declaration Statements [112] are **OVERRULED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Strike Plaintiff's Reply to Defendant's Response to the Plaintiff's Statement of Undisputed Material Facts [117] is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to File Substituted Appendix [119] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Quash Subpoena to Produce Documents [127] is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment [100] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Partial Motion for Summary Judgment as to Liability [101] is **DENIED**.

**IT IS FURTHER ORDERED** that the parties shall submit a pretrial order no later than 5:00 p.m., on January 27, 2012.

**IT IS FURTHER ORDERED** that this case is scheduled on the Court's March 19, 2012, trial calendar.

**SO ORDERED** this 28th day of December, 2011.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE